# Court of Appeals.

January 26, 1904.

## THE PEOPLE v. KATE TAYLOR.

(177 N. Y. 237.)

MURDER—EVIDENCE—PREVIOUS THREATS AND ASSAULTS BY DECEASED —SELF DEFENSE.

Evidence of previous threats and assaults made by the deceased against one charged with murder in the first degree, is competent, upon the question of whether the homicide was justifiable as having been committed in self defense, where the defendant has testified that the killing was accidental while they were struggling for the possession of a revolver which the deceased had shot at her, that she sought to prevent his getting possession of the weapon because of her apprehension that he would use it again upon her and that she believed from the language used towards her that he was going to take her life.

APPEAL from a judgment of the Supreme Court, rendered at a Trial Term for the county of Sullivan, May 30, 1903, upon a verdict convicting defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

Henry Willis Smith and William W. Smith for appellant. It is the contention of the defendant that she was acting in self-defense at the time the decedent came to his death. Evidence, therefore, of previous threats made by the deceas-

ed against her was improperly excluded. (Stokes v. People, 53 N. Y. 164; Abbott v. People, 86 N. Y. 460; People v. Jackson, 111 N. Y. 370; People v. Barberi, 149 N. Y. 256; Thomas v. People, 67 N. Y. 222; People v. Walworth, 4 N. Y. Cr. Rep. 355.)

Frank S. Anderson for respondent. There was no error in the exclusion of evidence. (People v. Druse, 103 N. Y. 656; People v. Hess, 8 App. Div. 148; People v. Constantino, 153 N. Y. 31; People v. Kennedy, 159 N. Y. 348.)

GRAY, J.

The defendant was charged with the crime of murder in the first degree, committed upon her husband by shooting him with a revolver and by cutting off his head with an axe. She was tried upon the indictment and the jury returned a verdict of guilty, as charged therein.

The defendant and her husband were in humble circumstances and, with a daughter by her former marriage, at the time of the homicide, occupied a small house, composed of two rooms and a pantry, and of an attic overhead, in an isolated part of Sullivan county. The occurrences attending the killing of the deceased were narrated by Ida De Kay, the daughter, who was about fourteen years of age, for the People, and by the accused, testifying in her own behalf. The daughter's testimony is to the effect that on Monday evening, January 26th, 1903, the deceased returned, intoxicated and in a quarrelsome mood. Her mother had to take from him a stove hook, with which he was breaking, or injuring, the household articles, and when an occasion was given by his going out of the house, she tried to put them out of his way. All three slept in a bedroom, containing two beds; one being used by the mother and daughter, and the other by the deceased. His bed was about opposite to a door of the bed-

room, opening outward into the adjoining room, which was called the kitchen.     After Ida had gone to bed, she was awakened from her sleep by hearing the sound of a shot.     By the light upon the table, she saw the deceased standing by the door leading into the kitchen.     She says that she heard him exclaim that he was shot and that ''if she would let him be until morning and not shoot him any more, he would get out and not bother her any more.''     Ida arose and went out of the bedroom, passing by her father; who was holding a strap, by which the door was fastened, and, with his other hand, was putting on his boots.     He allowed her to pass out and, then, she saw her mother standing in the kitchen by the bedroom door.     At first she went out upon the stoop; but, in a minute or two, returned into the kitchen and, while crossing it towards the pantry, at the further end, she heard another shot, which, she says, was in the kitchen.     She looked around and saw her mother trying to get the bedroom door open, by putting her hand through the crevice between the door casing and the door to reach the strap; the construction being of single planks, flimsily put together.     Succeeding in opening the door, she went into the room.     Ida followed her and saw the deceased lying upon the floor and her mother snapping a revolver at him.     She tried to reload the pistol with some cartridges; but, upon Ida's telling her not to do so, she desisted and put the weapon away.     Her father and mother were, both, dressed at the time.     Her mother then took an axe, which was standing at the foot of their bed, and cut off the head and right arm of the deceased. She put them into a stove, which stood in the bedroom, and burned them; using kerosene oil.     She cut off the other arm and the legs; put them and the trunk of the corpse away, and, on the next day, endeavored to consume the remains of the body by fire.     She pounded up the skull and the bones, and dispersed them; concealed the effects of the deceased; burned clothing and the axe handle and, as far as she could,

endeavored to remove all traces of the occurrence. She told the witness to say, if inquired of, that her father had gone to Orange county to look for a house. On the Sunday following, Ida says that she and her mother went to the residence of a relative, named Yerkins, and, in the course of a conversation, she heard her mother relate to him that she had killed her husband and burned him up, and that, now, he could come over and get the furniture. Yerkins laughed; said he would do so; inquired if everything had been cleaned up and, upon her mother's request, furnished her with some paint for use in the house. It was, also, then arranged that, after a while, the furniture was to be taken to a house, known as the Benson house; in which she and her mother were to take up their residence.

It, further, appeared, by Ida's testimony that, in the previous month of September, she overheard a conversation between her mother and Yerkins; in which the quarrelsomeness of the deceased having been spoken of, Yerkins said that, if he was in her place, he would kill the deceased and get rid of him, and that he would give her the Benson place. He suggested that she should kill him some night, when he was drunk.

This was, in substance, the material portion of the narrative of the witness, Ida, and, except as to what occured on the night of the homicide between her mother and her father, and as to what was said in the interviews between her mother and Yerkins, before and after that night, it is not contradicted. It received corroboration in the evidence of some facts, as well as in the testimony of witnesses, to whom the defendant, subsequently, made statements relating to the affair. The effects of the deceased and the axe were found in their places of concealment. Some burned flesh and bones found in the manure heap, were pronounced by medical experts to have been portions of the human body. Two bullets were found in the wall, over the bed of

the deceased, in a line with the door leading into the kitchen. There was a bullet hole through the casing of the door and upon the building paper, covering the casing, were marks of powder smoke. Measurements showed these to be about three feet and seven inches from the floor and that one bullet hole over the side of the bed was about three feet and eight inches from the floor.

According to the testimony of the two deputy sheriffs, the defendant, in conversation with one of them, upon being asked what she "did with the body after killing him," told how she had disposed of it; substantially, in the manner in which Ida had narrated it. This statement was after her arrest; but appears to have been made quite freely and notwithstanding that she had been cautioned not to speak.

The defendant testified, in her own behalf, that she was forty years of age ; that she had married the deceased in 1891 and how they had lived up to the time of the homicide. At one time, they had resided in Yerkins' house and her husband had worked for him. Yerkins was her half uncle and an unmarried man, of about forty-five years of age. Near to Yerkins' residence was the Benson place, in which they, also, had resided for some time. According to her account of the night of the homicide, her husband was killed during a scuffle between them over the possession of a pistol. She testified that, when he returned home that evening in his wagon, she went, as it had been her custom, to the stable to care for the horse ; that he was intoxicated and disorderly, and swore at her, and that, after they entered the house, he was violent ; knocking the furniture about and jerking the house door off its hinges. She moved some furniture and crockery aside and, after her daughter had retired, she lay down upon the bed, but without taking off her clothes. She did not go to sleep and lay there in fear, watching him. She heard him go out of the house and, when he re-entered the bedroom, he took her revolver,

which was in a box at the foot of her bed, and shot at her. She jumped up, took the revolver from his hands ; ran out into the kitchen and held the bed-room door closed. She opened it to let her daughter Ida pass out and, afterwards, upon her husband's saying to her that he would not bother her any more, she stepped back into the bedroom. He, then, seized the revolver, which she was holding in her hands, by the muzzle and, in the struggle for its possession, it was discharged and he was shot. She retreated to the kitchen ; holding the door closed until she heard the body drop and, going in with her daughter, found the dead body upon the floor. She says that there was a bullet wound in the side of the head ; substantiating Ida's statement that there was a wound in the temple. She denied having any idea, or intention, of killing her husband, and stated that the revolver had been purchased by her some months previously, as a protection, against attacks apprehended by her from a bear, said to be in the neighborhood, and from persons prowling about the country. She denied having any such conversation with Yerkins in the previous September, as her daughter had testified to. Her statement as to the interview with him upon the Sunday subsequent to the homicide is that she told him that her husband was dead, when he exclaimed, "Dead, you don't mean to say you have killed Taylor !" She says that she made no reply to this and that she did not tell him how the deceased had been killed ; otherwise than that he was shot. She testified that she did not deny chopping off, with an axe, the head of the deceased. She gave no testimony in contradiction of what had been narrated with respect to her acts in disposing of the body. She testified that there were only two shots and that her object in getting the revolver from her husband was to save her own life, as he had shot at her, and that, from his language, she supposed "he would take her life." In answer to a question as to whether the deceased had threatened to take her

life, and had made the attempt upon other occasions, she answered, "yes." This answer, however, was stricken out ; the trial judge ruling that such evidence was inadmissible, upon the theory of the defense that the killing of the deceased was accidental. An exception was noted to the ruling. The defendant called a witness and offered to show by him, and by a number of other witnesses, what had been the conduct of the deceased towards her ; threats made by him and injuries done to her since their marriage, "for the purpose of showing as a defense " that she had not committed the crime of murder, or of manslaughter, and to prove that what she "did upon that occasion * * * was justified in self-defense, to prevent Lafayette Taylor from inflicting upon her serious bodily harm and to prevent him from using the pistol and taking her life." The People objected and the witness was not permitted to be examined as to such facts ; nor was the defendant allowed to prove them by other witnesses. The defendant was allowed an exception to the rulings.

No exception was taken to the charge, which was sufficiently fair and temperate. Requests of the defendant to charge were, also, allowed as made ; or with such qualifications as were proper.

The case, as presented by this appeal, raises but one important question for our consideration and it is such as, in my opinion, seriously to affect the correctness of the judgment of conviction. Doubtless, the jurors were warranted in reaching their determination, upon the evidence before them, that the defendant was guilty of the charge of having deliberately murdered her husband. Such a determination could rest upon the testimony of the daughter, the sole eyewitness, and upon inference from corroborating facts and circumstances, which the proofs disclosed ; relating, not only, to the scene of the homicide, but to what subsequently took place at the interview with Yerkins, and to the confes-

sion made to the deputy sheriff after the arrest. They could find, believing Ida's story, that the defendant deliberately and premeditatedly killed the deceased, of her own design, or induced thereto by the previous arrangement with Yerkins, and that the motive was to get rid of a drunken and quarrelsome husband, or, in addition to such, to get possession of the Benson farm, promised by Yerkins. The opportunity and the means existed, and there was no lack of evidence from which to infer the existence of a motive. Notwithstanding the youth of the daughter, she appears to have given her testimony artlessly and neither confusion of mind, nor imagination, appears to have affected it. If it was murder, it was atrocious and revolting in its details ; but if it was homicide, committed in self-defense, or accidental, the defendant is not chargeable under the indictment and could not suffer thereunder because of what she did with the body, in the mistaken notion of destroying what she may have apprehended as damning evidences of the commission of a crime.

In my opinion for the trial judge to have excluded evidence proving, or tending to prove, previous violent conduct of the deceased towards the defendant and his threats against her, or his attempts to take her life upon other occasions, was an error gravely prejudicial to her defense ; because it deprived her of the right to have competent testimony in her favor considered by the jury. I know of no sufficient ground upon which the ruling may rest. The reasoning of the trial judge, in support of his exclusion of such testimony, was in disregard of the body of evidence ; whether we consider what were the circumstances under which the homicide occurred, or what was the whole of the testimony given by the accused concerning it. It is true that, in a portion of her testimony, she characterized the killing as accidental and it was upon the theory of a defense of accidental killing that the trial judge based his ruling ;

but what she may have said, to that effect, in response to questions put by the trial judge, or by counsel, must be taken in connection with her previous statements. She had testified that she sought to prevent his getting possession of the weapon, because of her apprehension that he would use it, again, upon her, and that she believed, from the language used toward her, that he was going to take her life. Upon her testimony, the facts were that the deceased was killed, while they were struggling for the possession of the weapon, and that she was justified, by reason of her fear, in resisting his efforts to obtain it ; from which it would follow, whether it was discharged by her intentionally, or as an accident of the struggle, that she was not liable to the charge in the indictment. She may have believed, or, upon reflection, may now believe, that the killing was an accidental incident; but, under her plea of not guilty, how can she be deprived of any evidence tending to acquit her upon the ground that she was acting under apprehension of great bodily harm ? Such a rule would be neither just nor human. The case presented to the jurors was one where the evidence as to what occurred between the defendant and her husband, at the time, was conflicting. Her own testimony was at variance with that of her daughter and the determination of the truth of what happened was left to the jurors upon the credit which they might give to the one or the other, under all the circumstances disclosed by the evidence. Whatever was corroborative of the testimony of the one, or the other, witness, if competent as proof, was admissible in evidence, and that it was corroborative of the defendant's evidence to show that she had reason to apprehend great bodily harm and, therefore, was justified, either, in using the weapon in self-defense, or in preventing its use by the deceased, cannot, reasonably, be denied. Under our statute, which, in that respect, but affirms the common-law rule, homicide is justifiable, when committed by a defendant in lawful

defense of his person; when there is reasonable ground to apprehend a design on the part of the person slain to do some great personal injury to the slayer, and when there is imminent danger of such design being accomplished. Of the reasonableness of the ground for the apprehension, it is, of course, for the jurors to judge from the evidence. Under the defendant's plea of not guilty, the whole matter of her guilt or innocence was referred to the jury and that included the intention, as well as all the facts of the transaction. However grewsome and callous the conduct of the defendant, in disposing of the body of her husband, the jurors could believe that she was innocent of the accusation and was endeavoring to avoid coming under suspicion of having caused his death. Her conduct, in that respect, was not actually inconsistent with innocence and should have no other weight in the accusation than as the acts may tend to supplement the direct, or circumstantial, evidence of an intentional killing. The homicide would be justifiable, whether appearances to her proved to be true or false; if they were such as to furnish reasonable grounds for her entertaining an apprehension of personal injury. (Shorter v. People, 2 N. Y. 197, 202.) It was for the prosecution to prove, beyond any reasonable doubt, the accusation made and the accused was not to be deprived of the benefit of any relevant fact, which might prove her innocence. If the jurors, upon the evidence, should believe that the homicide was accidental, the defendant would be innocent of any crime; or, if they should believe that the homicide was of her doing, but committed in an effort to defend her person, she was, equally, innocent. The defendant was entitled to the benefit of any competent, or relevant, fact, or of any reasonable inferences from facts proved, which might tend to establish her innocence of the crime charged, and evidence of previous attempts upon her life, or of threats against her, whether known to her or only to others, was admissible. The

case of People v. Druse (103 N. Y., 656), is authority for the proposition, simply, that a defendant, after giving evidence that the homicide was committed in self-defense, may follow it by proof of the general reputation of the deceased for quarrelsomeness and violence.   Stokes v. People (53 N. Y. 171), is authority upon the proposition that evidence of the threats of the deceased, whether communicated to the defendant, or not, was admissible ; because, in either case, it bore upon the question whether the homicide was excusable, as committed by the accused in defending himself against an attempt to murder, or to injure him ; or in resisting an attack, from which he had reasonable ground to apprehend either of those results.   In Abbott v. People (86 N. Y. 460), it was held that it was competent to show the reputation of the deceased for quarrelsomeness, vindictiveness and other like traits, in a case where an assault is threatened at the time when the homicide was committed, or is so intimately connected with it as to justify the taking of life in self-defense, or to ward off, or to prevent, a great impending and imminent danger of bodily harm.

In my judgment, the exclusion of this evidence was so grave an error that the defendant should be retried upon the charge made against her, when she may be permitted to introduce such evidence as she has, showing what were the relations between herself and her husband, what were his threats, or what his previous attempts upon her life.   With the exclusion of the evidence offered, I do not think it can, reasonably, be said by us that she has had that fair trial upon the indictment, to which she was entitled under the laws of this state.

The judgment of conviction should be reversed, and a new trial ordered.

PARKER, CH. J., O'BRIEN, BARTLETT, HAIGHT, MARTIN and CULLEN, JJ., concur.

Judgment of conviction reversed, etc.