OPINION OF THE COURT
Chief Judge Wachtler.
A Grand Jury has indicted defendant on attempted murder, assault, and other charges for having shot and wounded four youths on a New York City subway train after one or two of the youths approached him and asked for $5. The lower courts, concluding that the prosecutor’s charge to the Grand Jury on the defense of justification was erroneous, have dismissed the attempted murder, assault and weapons possession charges. We now reverse and reinstate all counts of the indictment.
I.
The precise circumstances of the incident giving rise to the charges against defendant are disputed, and ultimately it will be for a trial jury to determine what occurred. We feel it necessary, however, to provide some factual background to *100 properly frame the legal issues before us. Accordingly, we have summarized the facts as they appear from the evidence before the Grand Jury. We stress, however, that we do not purport to reach any conclusions or holding as to exactly what transpired or whether defendant is blameworthy. The credibility of witnesses and the reasonableness of defendant’s conduct are to be resolved by the trial jury.
On Saturday afternoon, December 22, 1984, Troy Canty, Darryl Cabey, James Ramseur, and Barry Allen boarded an IRT express subway train in The Bronx and headed south toward lower Manhattan. The four youths rode together in the rear portion of the seventh car of the train. Two of the four, Ramseur and Cabey, had screwdrivers inside their coats, which they said were to be used to break into the coin boxes of video machines.
Defendant Bernhard Goetz boarded this subway train at 14th Street in Manhattan and sat down on a bench towards the rear section of the same car occupied by the four youths. Goetz was carrying an unlicensed .38 caliber pistol loaded with five rounds of ammunition in a waistband holster. The train left the 14th Street station and headed towards Chambers Street.
It appears from the evidence before the Grand Jury that Canty approached Goetz, possibly with Allen beside him, and stated "give me five dollars”. Neither Canty nor any of the other youths displayed a weapon. Goetz responded by standing up, pulling out his handgun and firing four shots in rapid succession. The first shot hit Canty in the chest; the second struck Allen in the back; the third went through Ramseur’s arm and into his left side; the fourth was fired at Cabey, who apparently was then standing in the corner of the car, but missed, deflecting instead off of a wall of the conductor’s cab. After Goetz briefly surveyed the scene around him, he fired another shot at Cabey, who then was sitting on the end bench of the car. The bullet entered the rear of Cabey’s side and severed his spinal cord.
All but two of the other passengers fled the car when, or immediately after, the shots were fired. The conductor, who had been in the next car, heard the shots and instructed the motorman to radio for emergency assistance. The conductor then went into the car where the shooting occurred and saw Goetz sitting on a bench, the injured youths lying on the floor or slumped against a seat, and two women who had appar *101 ently taken cover, also lying on the floor. Goetz told the conductor that the four youths had tried to rob him.
While the conductor was aiding the youths, Goetz headed towards the front of the car. The train had stopped just before the Chambers Street station and Goetz went between two of the cars, jumped onto the tracks and fled. Police and ambulance crews arrived at the scene shortly thereafter. Ramseur and Canty, initially listed in critical condition, have fully recovered. Cabey remains paralyzed, and has suffered some degree of brain damage.
On December 31, 1984, Goetz surrendered to police in Concord, New Hampshire, identifying himself as the gunman being sought for the subway shootings in New York nine days earlier. Later that day, after receiving Miranda warnings, he made two lengthy statements, both of which were tape recorded with his permission. In the statements, which are substantially similar, Goetz admitted that he had been illegally carrying a handgun in New York City for three years. He stated that he had first purchased a gun in 1981 after he had been injured in a mugging. Goetz also revealed that twice between 1981 and 1984 he had successfully warded off assailants simply by displaying the pistol.
According to Goetz’s statement, the first contact he had with the four youths came when Canty, sitting or lying on the bench across from him, asked "how are you,” to which he replied "fine”. Shortly thereafter, Canty, followed by one of the other youths, walked over to the defendant and stood to his left, while the other two youths remained to his right, in the corner of the subway car. Canty then said "give me five dollars”. Goetz stated that he knew from the smile on Canty’s face that they wanted to "play with me”. Although he was certain that none of the youths had a gun, he had a fear, based on prior experiences, of being "maimed”.
Goetz then established "a pattern of fire,” deciding specifically to fire from left to right. His stated intention at that point was to "murder [the four youths], to hurt them, to make them suffer as much as possible”. When Canty again requested money, Goetz stood up, drew his weapon, and began firing, aiming for the center of the body of each of the four. Goetz recalled that the first two he shot "tried to run through the crowd [but] they had nowhere to run”. Goetz then turned to his right to "go after the other two”. One of these two "tried to run through the wall of the train, but * * * he had *102 nowhere to go”. The other youth (Cabey) "tried pretending that he wasn’t with [the others]” by standing still, holding on to one of the subway hand straps, and not looking at Goetz. Goetz nonetheless fired his fourth shot at him. He then ran back to the first two youths to make sure they had been "taken care of’. Seeing that they had both been shot, he spun back to check on the latter two. Goetz noticed that the youth who had been standing still was now sitting on a bench and seemed unhurt. As Goetz told the police, "I said *[y]ou seem to be all right, here’s another’ ”, and he then fired the shot which severed Cabey’s spinal cord. Goetz added that "if I was a little more under self-control * * * I would have put the barrel against his forehead and fired.” He also admitted that "if I had had more [bullets], I would have shot them again, and again, and again.”
II.
After waiving extradition, Goetz was brought back to New York and arraigned on a felony complaint charging him with attempted murder and criminal possession of a weapon. The matter was presented to a Grand Jury in January 1985, with the prosecutor seeking an indictment for attempted murder, assault, reckless endangerment, and criminal possession of a weapon. Neither the defendant nor any of the wounded youths testified before this Grand Jury. On January 25, 1985, the Grand Jury indicted defendant on one count of criminal possession of a weapon in the third degree (Penal Law § 265.02), for possessing the gun used in the subway shootings, and two counts of criminal possession of a weapon in the fourth degree (Penal Law § 265.01), for possessing two other guns in his apartment building. It dismissed, however, the attempted murder and other charges stemming from the shootings themselves.
Several weeks after the Grand Jury’s action, the People, asserting that they had newly available evidence, moved for an order authorizing them to resubmit the dismissed charges to a second Grand Jury (see, CPL 190.75 [3]). Supreme Court, Criminal Term, after conducting an in camera inquiry, granted the motion. Presentation of the case to the second Grand Jury began on March 14, 1985. Two of the four youths, Canty and Ramseur, testified. Among the other witnesses were four passengers from the seventh car of the subway who had seen some portions of the incident. Goetz again chose not to *103 testify, though the tapes of his two statements were played for the grand jurors, as had been done with the first Grand Jury.
On March 27, 1985, the second Grand Jury filed a 10-count indictment, containing four charges of attempted murder (Penal Law §§ 110.00, 125.25 [1]), four charges of assault in the first degree (Penal Law § 120.10 [1]), one charge of reckless endangerment in the first degree (Penal Law § 120.25), and one charge of criminal possession of a weapon in the second degree (Penal Law § 265.03 [possession of loaded firearm with intent to use it unlawfully against another]). Goetz was arraigned on this indictment on March 28, 1985, and it was consolidated with the earlier three-count indictment.[1]
On October 14, 1985, Goetz moved to dismiss the charges contained in the second indictment alleging, among other things, that the evidence before the second Grand Jury was not legally sufficient to establish the offenses charged (see, CPL 210.20 [1] [b]), and that the prosecutor’s instructions to that Grand Jury on the defense of justification were erroneous and prejudicial to the defendant so as to render its proceedings defective (see, CPL 210.20 [1] [c]; 210.35 [5]).
On November 25, 1985, while the motion to dismiss was pending before Criminal Term, a column appeared in the New York Daily News containing an interview which the columnist had conducted with Darryl Cabey the previous day in Cabey’s hospital room. The columnist claimed that Cabey had told him in this interview that the other three youths had all approached Goetz with the intention of robbing him. The day after the column was published, a New York City police officer informed the prosecutor that he had been one of the first police officers to enter the subway car after the shootings, and that Canty had said to him "we were going to rob [Goetz]”. The prosecutor immediately disclosed this information to the court and to defense counsel, adding that this was the first time his office had been told of this alleged statement and that none of the police reports filed on the incident contained any such information. Goetz then orally expanded his motion to *104 dismiss, asserting that resubmission of the charges voted by the second Grand Jury was required under People v Pelchat (62 NY2d 97) because it appeared, from this new information, that Ramseur and Canty had committed perjury.
In an order dated January 21, 1986, Criminal Term granted Goetz’s motion to the extent that it dismissed all counts of the second indictment, other than the reckless endangerment charge, with leave to resubmit these charges to a third Grand Jury. The court, after inspection of the Grand Jury minutes, first rejected Goetz’s contention that there was not legally sufficient evidence to support the charges. It held, however, that the prosecutor, in a supplemental charge elaborating upon the justification defense, had erroneously introduced an objective element into this defense by instructing the grand jurors to consider whether Goetz’s conduct was that of a "reasonable man in [Goetz’s] situation”. The court, citing prior decisions from both the First and Second Departments (see, e.g., People v Santiago, 110 AD2d 569 [1st Dept]; People v Wagman, 99 AD2d 519 [2d Dept]), concluded that the statutory test for whether the use of deadly force is justified to protect a person should be wholly subjective, focusing entirely on the defendant’s state of mind when he used such force. It concluded that dismissal was required for this error because the justification issue was at the heart of the case.[2]
Criminal Term also concluded that dismissal and resubmission of the charges were required under People v Pelchat (supra) because the Daily News column and the statement by the police officer to the prosecution strongly indicated that the testimony of Ramseur and Canty was perjured. Because the additional evidence before the second Grand Jury, as contrasted with that before the first Grand Jury, consisted largely of the testimony of these two youths, the court found that the integrity of the second Grand Jury was "severely undermined” by the apparently perjured testimony.
On appeal by the People, a divided Appellate Division *105 affirmed Criminal Term’s dismissal of the charges. The plurality opinion by Justice Kassal, concurred in by Justice Carro, agreed with Criminal Term’s reasoning on the justification issue, stating that the grand jurors should have been instructed to consider only the defendant’s subjective beliefs as to the need to use deadly force. Justice Kupferman concurred in the result reached by the plurality on the ground that the prosecutor’s charge did not adequately apprise the grand jurors of the need to consider Goetz’s own background and learning. Neither the plurality nor the concurring opinion discussed Criminal Term’s reliance on Pelchat as an alternate ground for dismissal.
Justice Asch, in a dissenting opinion in which Justice Wallach concurred, disagreed with both bases for dismissal relied upon by Criminal Term. On the justification question, he opined that the statute requires consideration of both the defendant’s subjective beliefs and whether a reasonable person in defendant’s situation would have had such beliefs. Accordingly, he found no error in the prosecutor’s introduction of an objective element into the justification defense. On the Pelchat issue, Justice Asch noted the extensive differences between the Grand Jury evidence in that case and the case at bar and concluded that the out-of-court statements attributed to Cabey and Canty did not affect the validity of the indictment. In a separate dissenting opinion, Justice Wallach stressed that the plurality’s adoption of a purely subjective test effectively eliminated any reasonableness requirement contained in the statute.
Justice Asch granted the People leave to appeal to this court. We agree with the dissenters that neither the prosecutor’s charge to the Grand Jury on justification nor the information which came to light while the motion to dismiss was pending required dismissal of any of the charges in the second indictment.
III.
Penal Law article 35 recognizes the defense of justification, which "permits the use of force under certain circumstances” (see, People v McManus, 67 NY2d 541, 545). One such set of circumstances pertains to the use of force in defense of a person, encompassing both self-defense and defense of a third person (Penal Law § 35.15). Penal Law § 35.15 (1) sets forth the general principles governing all such uses of force: "[a] *106 person may * * * use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person” (emphasis added).[3]
Section 35.15 (2) sets forth further limitations on these general principles with respect to the use of "deadly physical force”: "A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless (a) He reasonably believes that such other person is using or about to use deadly physical force * * *[4
[5]] or (b) He reasonably believes that such other person is committing or attempting to commit a kidnapping, forcible rape, forcible sodomy or robbery” (emphasis added).
Thus, consistent with most justification provisions, Penal Law § 35.15 permits the use of deadly physical force only where requirements as to triggering conditions and the necessity of a particular response are met (see, Robinson, Criminal Law Defenses § 121 [a], at 2). As to the triggering conditions, the statute requires that the actor "reasonably believes” that another person either is using or about to use deadly physical force or is committing or attempting to commit one of certain enumerated felonies, including robbery. As to the need for the use of deadly physical force as a response, the statute requires that the actor "reasonably believes” that such force is necessary to avert the perceived threat.[6]
Because the evidence before the second Grand Jury included statements by Goetz that he acted to protect himself from being maimed or to avert a robbery, the prosecutor correctly chose to charge the justification defense in section 35.15 to the Grand Jury (see, CPL 190.25 [6]; People v Valles, 62 NY2d 36, 38). The prosecutor properly instructed the grand jurors to *107 consider whether the use of deadly physical force was justified to prevent either serious physical injury or a robbery, and, in doing so, to separately analyze the defense with respect to each of the charges. He elaborated upon the prerequisites for the use of deadly physical force essentially by reading or paraphrasing the language in Penal Law § 35.15. The defense does not contend that he committed any error in this portion of the charge.
When the prosecutor had completed his charge, one of the grand jurors asked for clarification of the term "reasonably believes”. The prosecutor responded by instructing the grand jurors that they were to consider the circumstances of the incident and determine "whether the defendant’s conduct was that of a reasonable man in the defendant’s situation”. It is this response by the prosecutor — and specifically his use of "a reasonable man” — which is the basis for the dismissal of the charges by the lower courts. As expressed repeatedly in the Appellate Division’s plurality opinion, because section 35.15 uses the term "he reasonably believes”, the appropriate test, according to that court, is whether a defendant’s beliefs and reactions were "reasonable to him”. Under that reading of the statute, a jury which believed a defendant’s testimony that he felt that his own actions were warranted and were reasonable would have to acquit him, regardless of what anyone else in defendant’s situation might have concluded. Such an interpretation defies the ordinary meaning and significance of the term "reasonably” in a statute, and misconstrues the clear intent of the Legislature, in enacting section 35.15, to retain an objective element as part of any provision authorizing the use of deadly physical force.
Penal statutes in New York have long codified the right recognized at common law to use deadly physical force, under appropriate circumstances, in self-defense (see, e.g., 1829 Rev Stat of NY, part IV, ch 1, tit II, § 3; 1881 Penal Code § 205; People v McManus, supra, at p 546). These provisions have never required that an actor’s belief as to the intention of another person to inflict serious injury be correct in order for the use of deadly force to be justified, but they have uniformly required that the belief comport with an objective notion of reasonableness. The 1829 statute, using language which was followed almost in its entirety until the 1965 recodification of the Penal Law, provided that the use of deadly force was justified in self-defense or in the defense of specified third persons "when there shall be a reasonable ground to appre *108 hend a design to commit a felony, or to do some great personal injury, and there shall be imminent danger of such design being accomplished”.
In Shorter v People (2 NY 193), we emphasized that deadly force could be justified under the statute even if the actor’s beliefs as to the intentions of another turned out to be wrong, but noted there had to be a reasonable basis, viewed objectively, for the beliefs. We explicitly rejected the position that the defendant’s own belief that the use of deadly force was necessary sufficed to justify such force regardless of the reasonableness of the beliefs (id., at pp 200-201).
In 1881, New York reexamined the many criminal provisions set forth in the revised statutes and enacted, for the first time, a separate Penal Code (see generally, 1937 Report of NY Law Rev Commn, Communication to Legislature Relating to Homicide, at 525, 529 [hereafter cited as Communication Relating to Homicide]). The provision in the 1881 Penal Code for the use of deadly force in self-defense or to defend a third person was virtually a reenactment of the language in the 1829 statutes,[6] and the "reasonable ground” requirement was maintained.
The 1909 Penal Law replaced the 1881 Penal Code. The language of section 205 of the 1881 code pertaining to the use of deadly force in self-defense or in defense of a third person was reenacted, verbatim, as part of section 1055 of the new Penal Law. Several cases from this court interpreting the 1909 provision demonstrate unmistakably that an objective element of reasonableness was a vital part of any claim of self-defense. In People v Lumsden (201 NY 264, 268), we approved a charge to the jury which instructed it to consider whether the circumstances facing defendant were such "as would lead a reasonable man to believe that [an assailant] is about to kill or to do great bodily injury” (see also, People v Ligouri, 284 NY 309, 316, 317). We emphatically rejected the position that any belief by an actor as to the intention of another to cause severe injury was a sufficient basis for his use of deadly force, and stated specifically that a belief based upon "mere fear or fancy or remote hearsay information or a delusion pure and simple” would not satisfy the requirements of the statute (201 NY, at p 269). In People v Tomlins (213 NY *109 240, 244), we set forth the governing test as being whether "the situation justified the defendant as a reasonable man in believing that he was about to be murderously attacked.”
Accordingly, the Law Revision Commission, in a 1937 Report to the Legislature on the Law of Homicide in New York, summarized the self-defense statute as requiring a "reasonable belief in the imminence of danger”, and stated that the standard to be followed by a jury in determining whether a belief was reasonable "is that of a man of ordinary courage in the circumstances surrounding the defendant at the time of the killing” (Communication Relating to Homicide, op. cit., at 814). The Report added that New York did not follow the view, adopted in a few States, that "the jury is required to adopt the subjective view and judge from the standpoint of the very defendant concerned” (id., at 814).
In 1961 the Legislature established a Commission to undertake a complete revision of the Penal Law and the Criminal Code. The impetus for the decision to update the Penal Law came in part from the drafting of the Model Penal Code by the American Law Institute, as well as from the fact that the existing law was poorly organized and in many aspects antiquated (see, e.g., Criminal Law Revision Through A Legislative Commission: The New York Experience, 18 Buff L Rev 213; Note, Proposed Penal Law of New York, 64 Colum L Rev 1469). Following the submission by the Commission of several reports and proposals, the Legislature approved the present Penal Law in 1965 (L 1965, ch 1030), and it became effective on September 1, 1967. The drafting of the general provisions of the new Penal Law (see, Penal Law part I), including the article on justification (id., art 35), was particularly influenced by the Model Penal Code (see, Denzer, Drafting a New York Penal Law for New York, 18 Buff L Rev 251, 252; Wechsler, Codification of Criminal Law in the United States: The Model Penal Code, 68 Colum L Rev 1425, 1428). While using the Model Penal Code provisions on justification as general guidelines, however, the drafters of the new Penal Law did not simply adopt them verbatim.
The provisions of the Model Penal Code with respect to the use of deadly force in self-defense reflect the position of its drafters that any culpability which arises from a mistaken belief in the need to use such force should be no greater than the culpability such a mistake would give rise to if it were made with respect to an element of a crime (see, ALI, Model *110 Penal Code and Commentaries, part I, at 32, 34 [hereafter cited as MPC Commentaries]; Robinson, Criminal Law Defenses, op. cit., at 410). Accordingly, under Model Penal Code § 3.04 (2) (b), a defendant charged with murder (or attempted murder) need only show that he "believefd] that [the use of deadly force] was necessary to protect himself against death, serious bodily injury, kidnapping or [forcible] sexual intercourse” to prevail on a self-defense claim (emphasis added). If the defendant’s belief was wrong, and was recklessly, or negligently formed, however, he may be convicted of the type of homicide charge requiring only a reckless or negligent, as the case may be, criminal intent (see, Model Penal Code § 3.09 [2]; MPC Commentaries, op. cit., part I, at 32, 150).
The drafters of the Model Penal Code recognized that the wholly subjective test set forth in section 3.04 differed from the existing law in most States by its omission of any requirement of reasonableness (see, MPC Commentaries, op. cit., part I, at 35; LaFave & Scott, Criminal Law § 53, at 393-394). The drafters were also keenly aware that requiring that the actor have a "reasonable belief’ rather than just a "belief’ would alter the wholly subjective test (MPC Commentaries, op. cit., part I, at 35-36). This basic distinction was recognized years earlier by the New York Law Revision Commission and continues to be noted by the commentators (Communication Relating to Homicide, op. cit, at 814; Robinson, Criminal Law Defenses, op. cit.; Note, Justification: The Impact of the Model Penal Code on Statutory Reform, 75 Colum L Rev 914, 918-920).
New York did not follow the Model Penal Code’s equation of a mistake as to the need to use deadly force with a mistake negating an element of a crime, choosing instead to use a single statutory section which would provide either a complete defense or no defense at all to a defendant charged with any crime involving the use of deadly force. The drafters of the new Penal Law adopted in large part the structure and content of Model Penal Code § 3.04, but, crucially, inserted the word "reasonably” before "believes”.
The plurality below agreed with defendant’s argument that the change in the statutory language from "reasonable ground,” used prior to 1965, to "he reasonably believes” in Penal Law § 35.15 evinced a legislative intent to conform to the subjective standard contained in Model Penal Code § 3.04. This argument, however, ignores the plain significance of the *111 insertion of "reasonably”. Had the drafters of section 35.15 wanted to adopt a subjective standard, they could have simply used the language of section 3.04. "Believes” by itself requires an honest or genuine belief by a defendant as to the need to use deadly force (see, e.g., Robinson, Criminal Law Defenses, op. cit. § 184 (b), at 399-400). Interpreting the statute to require only that the defendant’s belief was "reasonable to him, ” as done by the plurality below, would hardly be different from requiring only a genuine belief; in either case, the defendant’s own perceptions could completely exonerate him from any criminal liability.
We cannot lightly impute to the Legislature an intent to fundamentally alter the principles of justification to allow the perpetrator of a serious crime to go free simply because that person believed his actions were reasonable and necessary to prevent some perceived harm. To completely exonerate such an individual, no matter how aberrational or bizarre his thought patterns, would allow citizens to set their own standards for the permissible use of force. It would also allow a legally competent defendant suffering from delusions to kill or perform acts of violence with impunity, contrary to fundamental principles of justice and criminal law.
We can only conclude that the Legislature retained a reasonableness requirement to avoid giving a license for such actions. The plurality’s interpretation, as the dissenters below recognized, excises the impact of the word "reasonably”. This same conclusion was recently reached in Justice Levine’s decision for a unanimous Third Department in People v Astle (117 AD2d 382), in which that court declined to follow the First Department’s decision in this case (see also, People v Hamel, 96 AD2d 644 [3d Dept]).
The change from "reasonable ground” to "reasonably believes” is better explained by the fact that the drafters of section 35.15 were proposing a single section which, for the first time, would govern both the use of ordinary force and deadly force in self-defense or defense of another. Under the 1909 Penal Law and its predecessors, the use of ordinary force was governed by separate sections which, at least by their literal terms, required that the defendant was in fact responding to an unlawful assault, and not just that he had a reasonable ground for believing that such an assault was occurring (see, 1909 Penal Law §§ 42, 246 [3]; People v Young, 11 NY2d 274; 7 Zett, New York Criminal Practice H 65.3). *112 Following the example of the Model Penal Code, the drafters of section 35.15 eliminated this sharp dichotomy between the use of ordinary force and deadly force in defense of a person. Not surprisingly then, the integrated section reflects the wording of Model Penal Code § 3.04, with the addition of "reasonably” to incorporate the long-standing requirement of "reasonable ground” for the use of deadly force and apply it to the use of ordinary force as well (see, Zett, New York Criminal Practice, § 65.3 [1], [2]; Note, Proposed Penal Law of New York, 64 Colum L Rev 1469, 1500).
The conclusion that section 35.15 retains an objective element to justify the use of deadly force is buttressed by the statements of its drafters. The executive director and counsel to the Commission which revised the Penal Law have stated that the provisions of the statute with respect to the use of deadly physical force largely conformed with the prior law, with the only changes they noted not being relevant here (Denzer & McQuillan, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 35.15, p 63 [1967]). Nowhere in the legislative history is there any indication that "reasonably believes” was designed to change the law on the use of deadly force or establish a subjective standard. To the contrary, the Commission, in the staff comment governing arrests by police officers, specifically equated "[he] reasonably believes” with having a reasonable ground for believing (Penal Law § 35.30; Fourth Interim Report of the Temporary State Commission on Revision of the Penal Law and Criminal Code at 17-18, 1965 NY Legis Doc No. 25).
Statutes or rules of law requiring a person to act "reasonably” or to have a "reasonable belief” uniformly prescribe conduct meeting an objective standard measured with reference to how "a reasonable person” could have acted (see, e.g., People v Cantor, 36 NY2d 106; Donovan v Kaszycki & Sons Contrs., 599 F Supp 860, 871; Klotter, Criminal Law, at 312; Fletcher, The Right and the Reasonable, 98 Harv L Rev 949; 57 Am Jur 2d, Negligence, §§ 67, 68). In People v Cantor (supra), we had before us a provision of the Criminal Procedure Law authorizing a police officer to stop a person "when he reasonably suspects that such person is committing, has committed or is about to commit [a crime]” (CPL 140.50 [1]; emphasis added). We held that this section authorized "stops” only when the police officer had "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man *113 under the circumstances to believe criminal activity is at hand” (People v Cantor, 36 NY2d, at pp 112-113, supra).
In People v Collice (41 NY2d 906), we rejected the position that section 35.15 contains a wholly subjective standard. The defendant in Collice asserted, on appeal, that the trial court had erred in refusing to charge the justification defense. We upheld the trial court’s action because we concluded that, even if the defendant had actually believed that he was threatened with the imminent use of deadly physical force, the evidence clearly indicated that "his reactions were not those of a reasonable man acting in self-defense” (id., at p 907). Numerous decisions from other States interpreting "reasonably believes” in justification statutes enacted subsequent to the drafting of the Model Penal Code are consistent with Collice, as they hold that such language refers to what a reasonable person could have believed under the same circumstances (see, e.g., State v Kelly, 97 NJ 178, 478 A2d 364, 373-374; Weston v State, 682 P2d 1119, 1121 [Alaska]).
The defense contends that our memorandum in Collice is inconsistent with our prior opinion in People v Miller (39 NY2d 543). In Miller, we held that a defendant charged with homicide could introduce, in support of a claim of self-defense, evidence of prior acts of violence committed by the deceased of which the defendant had knowledge. The defense, as well as the plurality below, place great emphasis on the statement in Miller that "the crucial fact at issue [is] the state of mind of the defendant” (id., at p 551). This language, however, in no way indicates that a wholly subjective test is appropriate. To begin, it is undisputed that section 35.15 does contain a subjective element, namely that the defendant believed that deadly force was necessary to avert the imminent use of deadly force or the commission of certain felonies. Evidence that the defendant knew of prior acts of violence by the deceased could help establish his requisite beliefs. Moreover, such knowledge would also be relevant on the issue of reasonableness, as the jury must consider the circumstances a defendant found himself in, which would include any relevant knowledge of the nature of persons confronting him (see, e.g., People v Taylor, 177 NY 237, 245; Communication Relating to Homicide, op. cit, at 816). Finally, in Miller, we specifically recognized that there had to be "reasonable grounds” for the defendant’s belief.
Goetz’s reliance on People v Rodawald (177 NY 408) is *114 similarly misplaced. In Rodawald, decided under the 1881 Penal Code, we held that a defendant who claimed that he had acted in self-defense could introduce evidence as to the general reputation of the deceased as a violent person if this reputation was known to the defendant when he acted. We stated, as emphasized by Goetz, that such evidence, "when known to the accused, enables him to judge of the danger and aids the jury in deciding whether he acted in good faith and upon the honest belief that his life was in peril. It shows the state of his mind as to the necessity of defending himself’ (177 NY, at p 423). Again, such language is explained by the fact that the threshold question, before the reasonableness issue is addressed, is the subjective beliefs of the defendant. Nowhere in Rodawald did we hold that the only test, as urged by Goetz, is whether the defendant honestly and in good faith believed himself to be in danger. Rather, we recognized that there was also the separate question of whether the accused had "reasonable ground” for his belief, and we upheld the trial court’s refusal to charge the jury that the defendant’s honest belief was sufficient to establish self-defense (177 NY, at pp 423, 426-427).
Goetz also argues that the introduction of an objective element will preclude a jury from considering factors such as the prior experiences of a given actor and thus, require it to make a determination of "reasonableness” without regard to the actual circumstances of a particular incident. This argument, however, falsely presupposes that an objective standard means that the background and other relevant characteristics of a particular actor must be ignored. To the contrary, we have frequently noted that a determination of reasonableness must be based on the "circumstances” facing a defendant or his "situation” (see, e.g., People v Ligouri, 284 NY 309, 316, supra; People v Lumsden, 201 NY 264, 268, supra). Such terms encompass more than the physical movements of the potential assailant. As just discussed, these terms include any relevant knowledge the defendant had about that person. They also necessarily bring in the physical attributes of all persons involved, including the defendant. Furthermore, the defendant’s circumstances encompass any prior experiences he had which could provide a reasonable basis for a belief that another person’s intentions were to injure or rob him or that the use of deadly force was necessary under the circumstances.
Accordingly, a jury should be instructed to consider this *115 type of evidence in weighing the defendant’s actions. The jury must first determine whether the defendant had the requisite beliefs under section 35.15, that is, whether he believed deadly force was necessary to avert the imminent use of deadly force or the commission of one of the felonies enumerated therein. If the People do not prove beyond a reasonable doubt that he did not have such beliefs, then the jury must also consider whether these beliefs were reasonable. The jury would have to determine, in light of all the "circumstances”, as explicated above, if a reasonable person could have had these beliefs.
The prosecutor’s instruction to the second Grand Jury that it had to determine whether, under the circumstances, Goetz’s conduct was that of a reasonable man in his situation was thus essentially an accurate charge. It is true that the prosecutor did not elaborate on the meaning of "circumstances” or "situation” and inform the grand jurors that they could consider, for example, the prior experiences Goetz related in his statement to the police. We have held, however, that a Grand Jury need not be instructed on the law with the same degree of precision as the petit jury (see, People v Valles, 62 NY2d 36, 38; People v Calbud, Inc., 49 NY2d 389, 394; compare, CPL 190.25 [6], with CPL 300.10 [2]). This lesser standard is premised upon the different functions of the Grand Jury and the petit jury: the former determines whether sufficient evidence exists to accuse a person of a crime and thereby subject him to criminal prosecution; the latter ultimately determines the guilt or innocence of the accused, and may convict only where the People have proven his guilt beyond a reasonable doubt (see, People v Calbud, Inc., 49 NY2d, at p 394, supra).
In People v Calbud, Inc. (supra, at pp 394-395), we stated that the prosecutor simply had to "provid[e] the Grand Jury with enough information to enable it intelligently to decide whether a crime has been committed and to determine whether there exists legally sufficient evidence to establish the material elements of the crime”. Of course, as noted above, where the evidence suggests that a complete defense such as justification may be present, the prosecutor must charge the grand jurors on that defense, providing enough information to enable them to determine whether the defense, in light of the evidence, should preclude the criminal prosecution. The prosecutor more than adequately fulfilled this obligation here. His instructions were not as complete as the court’s charge on justification should be, but they sufficiently apprised the *116 Grand Jury of the existence and requirements of that defense to allow it to intelligently decide that there is sufficient evidence tending to disprove justification and necessitating a trial. The Grand Jury has indicted Goetz. It will now be for the petit jury to decide whether the prosecutor can prove beyond a reasonable doubt that Goetz’s reactions were unreasonable and therefore excessive.
IV.
Criminal Term’s second ground for dismissal of the charges, premised upon the Daily News column and the police officer’s statement to the prosecutor, can be rejected more summarily. The court relied upon People v Pelchat (62 NY2d 97, supra), the facts of which, however, are markedly different from those here. In Pelchat, the defendant was one of 21 persons arrested in a house to which police officers had seen marihuana delivered. The only evidence before the Grand Jury showing that defendant had anything to do with the marihuana was the testimony of a police officer listing defendant as one of 21 persons he had observed transporting the drug. After defendant was indicted, this same police officer told the prosecutor that he had misunderstood his question when testifying before the Grand Jury and that he had not seen defendant engage in any criminal activity. Although the prosecutor knew that there was no other evidence before the Grand Jury to establish the defendant’s guilt, he did not disclose the police officer’s admission, and instead, accepted a guilty plea from the defendant. We reversed the conviction and dismissed the indictment, holding that the prosecutor should not have allowed the proceedings against defendant to continue when he knew that the only evidence against him before the Grand Jury was false, and thus, knew that there was not legally sufficient evidence to support the indictment.
Here, in contrast, Canty and Ramseur have not recanted any of their Grand Jury testimony or told the prosecutor that they misunderstood any questions. Instead, all that has come to light is hearsay evidence that conflicts with part of Canty’s testimony. There is no statute or controlling case law requiring dismissal of an indictment merely because, months later, the prosecutor becomes aware of some information which may lead to the defendant’s acquittal. There was no basis for the Criminal Term Justice to speculate as to whether Canty’s and Ramseur’s testimony was perjurious (see, CPL 190.25 [5]), and *117 his conclusion that the testimony "strongly appeared” to be perjured is particularly inappropriate given the nature of the "evidence” he relied upon to reach such a conclusion and that he was not in the Grand Jury room when the two youths testified.
Moreover, unlike Pelchat, the testimony of Canty and Ramseur was not the only evidence before the Grand Jury establishing that the offenses submitted to that body were committed by Goetz. Goetz’s own statements, together with the testimony of the passengers, clearly support the elements of the crimes charged, and provide ample basis for concluding that a trial of this matter is needed to determine whether Goetz could have reasonably believed that he was about to be robbed or seriously injured and whether it was reasonably necessary for him to shoot four youths to avert any such threat.
Accordingly, the order of the Appellate Division should be reversed, and the dismissed counts of the indictment reinstated.
Judges Meyer, Simons, Kaye, Alexander, Titone and Hancock, Jr., concur.
Order reversed, etc.

. On May 14, 1985, Goetz commenced an article 78 proceeding in the Appellate Division seeking to prohibit a trial on the charges contained in the second indictment on the ground that the order allowing resubmission of the charges was an abuse of discretion. The Appellate Division dismissed the proceeding on the ground that prohibition did not lie to review the type of error alleged by Goetz (111 AD2d 729, 730), and this court denied a motion for leave to appeal from the Appellate Division order (65 NY2d 609). The propriety of the resubmission order is not before us on this appeal.

. The court did not dismiss the reckless endangerment charge because, relying on the Appellate Division decision in People v McManus (108 AD2d 474), it held that justification was not a defense to a crime containing, as an element, "depraved indifference to human life.” As our reversal of the Appellate Division in McManus holds, justification is a defense to such a crime (People v McManus, 67 NY2d 541). Accordingly, had the prosecutor’s instructions on justification actually rendered the Grand Jury proceedings defective, dismissal of the reckless endangerment count would have been required as well.

. Subdivision (1) contains certain exceptions to this general authorization to use force, such as where the actor himself was the initial aggressor.

. Section 35.15 (2) (a) further provides, however, that even under these circumstances a person ordinarily must retreat "if he knows that he can with complete safety as to himself and others avoid the necessity of [using deadly physical force] by retreating”.

. While the portion of section 35.15 (2) (b) pertaining to the use of deadly physical force to avert a felony such as robbery does not contain a separate "retreat” requirement, it is clear from reading subdivisions (1) and (2) of section 35.15 together, as the statute requires, that the general "necessity” requirement in subdivision (1) applies to all uses of force under section 35.15, including the use of deadly physical force under subdivision (2) (b).

. The 1881 provision expanded the class of third persons for whose defense an actor could employ deadly force from certain specified persons to any other person in the actor’s presence.