■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PATRICK MAHER, Appellant.—Judgment of the Supreme Court,

New York County (Franklin Weissberg, J.), rendered January 9, 1990, after trial by jury, convicting defendant of two counts of criminally negligent homicide and driving while impaired, and sentencing him to six months incarceration, five years probation, and five hundred hours of community service, and imposing a $250 fine, is affirmed.

Defendant's guilt of criminally negligent homicide was proven beyond a reasonable doubt by overwhelming evidence. Defendant created a "substantial and unjustifiable" (Penal Law § 15.05 [4]) risk of death by racing down West Street at an excessive rate of speed in the early morning hours after a night of continuous beer drinking. He passed a number of red lights (and indeed he admitted that he ran a red light) before he struck and killed the young victim, Frank Flotteron. His failure to perceive the risk was a "gross deviation" (Penal Law § 15.05 [4]) from reasonable care that is "apparent to anyone who shares the community's general sense of right and wrong". *(People v Boutin,* 75 NY2d 692, 696.)

While the dissent finds the occupants of the Volkswagen "reckless" for pursuing defendant through city streets, it nevertheless agrees with the defendant in his fifty-six page brief and six page reply brief that the evidence is insufficient to sustain a conviction of criminally negligent homicide against defendant. However, defendant here continued to speed *after* the pursuit by the Volkswagen was discontinued and drove while impaired by alcohol, not slowing down when he hit the 19-year old, propelling the youth 131 feet south of the point of impact, not blowing his horn before the impact and not stopping after the impact but continuing southbound until he struck and uprooted a no-standing sign, then veering and hitting an island—all without leaving any skid marks. Further, two witnesses testified defendant was driving at 70 to 80 mph, two blocks south of Canal Street where the first accident took place. Another witness estimated the defendant's speed at the time he struck the young Flotteron to be 75 mph. A fourth estimated the speed at 80-85 and a fifth witness gave an estimate of over 90 mph. The dissent further raises the "possibility" that the 19-year old victim had ingested cocaine and was also impaired by the consumption of alcohol while asserting, on the other hand, that the "source [of defendant's impairment] is a subject of some uncertainty". However, the victim was not legally intoxicated and there was no evidence he ingested cocaine. In any event, contrary to the suggestion in the dissent that his presence in the southbound traffic lane was not "satisfactorily explained", the 19-year old

was *walking* with his friend in an effort to alleviate his friend's car sickness before continuing their journey. We note, also, that while the dissent refers to the victim's car being parked illegally on a "highway" and refers to the street herein as a "major highway", the record shows the homicide occurred on West Street *not* the West Side Highway. The posted speed limit is 35 mph and there are traffic lights on each corner. Battery Park City, which is a large residential community borders on West Street. Further, there was no "uncertainty" as to the People's evidence pertaining to defendant's conduct, including his alcohol consumption, which the jury accepted in reaching its verdict. "The standard for reviewing the legal sufficiency of evidence in a criminal case is whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' *(Jackson v Virginia,* 443 US 307, 319 [emphasis in original])" *(People v Contes,* 60 NY2d 620, 621). Dawn and Carl Powlett, who observed the first accident, and Strangalos and Lambropoulos who were in the Volkswagen which defendant hit all described defendant as "intoxicated" at this time and location—only a mile from the scene of the homicide.

The dissent correctly sets forth the proper test for the justification defense from *People v Goetz* (68 NY2d 96), i.e., whether a reasonable person in the situation in which defendant found himself, giving due regard to the circumstances confronting him, would have reasonably entertained the belief that a threat to his safety existed.

However, defendant was not entitled to have the jury consider his justification defense with respect to the homicide counts since there was no reasonable view of the evidence supporting this defense *(see, People v Watts,* 57 NY2d 299, 301-302). Justification, as raised in the present case, would hold a person harmless from criminal liability for conduct which would otherwise constitute an offense when "[s]uch conduct is necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no fault of the actor, and which is of such gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding such injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue." (Penal Law § 35.05 [2].)

Defendant's testimony did not establish that at the time he struck Flotteron his fear of injury was objectively reasonable

or that the victim was killed while defendant was executing an emergency measure to avoid imminent injury. Defendant ran down the young victim *after* the alleged crisis involving the prior crash with the Volkswagen had passed. Defendant testified that his car was followed by the Volkswagen when he fled from the first accident, but he also said that his pursuers stopped at a red light while he did not and that he slowed down since he did not see the Volkswagen any longer. Accordingly, by his own testimony, the victim was not struck when defendant was avoiding injury that was "about to occur". (Penal Law § 35.05 [2].) Further, even when the first accident occurred, crediting defendant's testimony only, he was not threatened with any weapon, nor did he even see any weapon.

We have examined defendant's remaining contentions and find them to be without merit. Concur—Ross, J. P., Milonas and Asch, JJ.

Ellerin and Rubin, JJ., dissent in a memorandum by Rubin, J., as follows: The question raised by this appeal is whether the jury should have been instructed on the defense of justification (Penal Law § 35.05 [2]). In their brief, the People devote nearly 60 pages to a recitation and factual analysis of the evidence. Based upon their interpretation of the facts, the People conclude that there was not imminent threat to defendant's person and, therefore, no basis upon which to charge the jury on the defense of justification.

The justification defense is to be accorded "the broadest possible scope" *(People v McManus,* 67 NY2d 541, 547), and may be asserted "regardless of the relevant *mens rea" (supra,* at 547). Considering the record most favorably to the defendant *(People v Steele,* 26 NY2d 526, 529), if "any reasonable view of the evidence would permit the fact finder to decide that the conduct of the accused was justified, an instruction on the defense should be given" *(People v McManus, supra,* at 549). I regard the evidence as amenable to such an interpretation and conclude that the failure to give the instruction constitutes reversible error *(supra).*

From the facts adduced at trial, it would not be unreasonable to conclude that defendant perceived a threat to his person when Marios Strangalos, whose car defendant had just struck, allegedly threatened to exchange "a lot more" than information and reached into his car, apparently to obtain a weapon; that the threat continued while Strangalos and his male passenger pursued defendant's car down West Street; and that defendant, having lost sight of the pursuing car, had

just begun to slow down when he struck Frank Flotteron, killing him. The People's expert witness testified that, based upon the decedent's trajectory, the minimum speed of defendant's vehicle was 37 miles per hour and, based upon the distance from the point of impact, its estimated speed was 51 miles per hour.

The People attempt to argue that, because it is unreasonable for defendant to have believed that an immediate threat to his person existed at the time he struck Flotteron, the defense of justification is unavailable. However, whether a reasonable person in the situation in which defendant found himself, giving due regard to the circumstances confronting him, would have reasonably entertained the belief that a threat to his safety existed is exclusively within the province of the jury (People v Goetz, 68 NY2d 96). An assessment of whether, at the time Flotteron was struck, it was reasonable for defendant to have perceived a threat or whether, as the majority contends, it was reasonably attenuated involves questions of fact and credibility which the jury must resolve and about which this court should not speculate.

As to defendant's assertion that his conviction is against the weight of the evidence, the record raises some troubling questions. Flotteron's death was the result of a confluence of factors and, while negligence abounds in this case, only some of it is attributable to defendant. Most disconcerting is that, whatever threat Strangalos and his companion might have represented because of what they may have intended to do to defendant if they caught up with him, it is clear that defendant presented no threat to them. Moreover, they had already noted defendant's license plate number which they later gave to police, and their pursuit of defendant's vehicle through city streets can only be viewed as reckless.

Regarding the victim, Frank Flotteron, his car was illegally parked on a highway, at around 4:00 A.M., between two non-working streetlights for some 15 to 20 minutes prior to the accident. Flotteron and one of his four companions, John Reese, were out of the car allegedly walking around because Reese felt car-sick, both dressed in dark clothing. Their presence in the southbound traffic lanes is not satisfactorily explained because the testimony indicates that there was a safe side street 120 feet away from where Flotteron had parked. Moreover, at the point where Reese testified they were crossing to the other side of the roadway, there is a concrete divider several feet high separating the three northbound lanes from the three southbound lanes. Brian Forte, another

of Flotteron's passengers, testified that, just as defendant's vehicle approached, the two men were "stopped at a dead halt on the street, talking to each other, face to face" in the center lane, four or five feet from the driver's side of Flotteron's car.

An autopsy revealed that Flotteron had a blood alcohol level of .09 percent, indicating that he was impaired by the consumption of alcohol (Vehicle and Traffic Law § 1195 [2] [c]). In addition, his blood contained lidocaine, a drug which, according to expert testimony, is often used to cut cocaine. However, the Medical Examiner's Office neglected to perform any test to determine whether metabolites of cocaine were also present in his system. Since there is no mention in any of the medical records that lidocaine was administered in the course of treatment, there remains a distinct possibility that Flotteron had ingested cocaine, in addition to alcohol, shortly before his death.

While defendant was driving while impaired and has not appealed from his conviction on that charge, that finding alone does not render him incapable of operating a motor vehicle (*People v Hoag*, 51 NY2d 632, 636), much less criminally negligent. In fact, given the respective positions of Reese, Flotteron and Flotteron's car across the southbound lanes of the highway, it may have been impossible for a vehicle to get past without striking at least one of them.

Flotteron was struck when defendant, travelling in the right-hand lane, swerved left to avoid hitting Flotteron's car, illegally parked in that lane. Seeing Reese in the roadway directly in his path, defendant steered his vehicle back towards the right in order to avoid striking him, and thereupon collided with Flotteron whom he never even saw. Defendant's actions in attempting to avoid the accident were entirely reasonable. Upon seeing Flotteron's automobile in the right lane, defendant steered into the center lane where he saw Reese who, according to Reese's testimony, was running east across the road towards the center divider. Defendant steered back towards the right but was limited in how far he could maneuver by the presence of Flotteron's vehicle in the right lane. The right front fender of defendant's car struck Flotteron who, again according to Reese's testimony, was proceeding west towards the river. Although Reese stated that Flotteron was in the right or curb lane at the time he was struck, this testimony leaves unexplained how defendant could have avoided striking Flotteron's parked car in the process of entering the curb lane. Therefore, a reasonable analysis of the evidence suggests that, at the time of impact, Reese was in the

left lane (which is exactly his testimony), Flotteron's car was parked in the right lane and Flotteron himself was in the center lane. A driver proceeding along a major highway in the dead of night could hardly be expected to anticipate such an unusual emergency situation as finding his passage blocked by the presence of a person or vehicle in each lane of traffic. These circumstances render a collision of some kind not criminally negligent (Penal Law § 125.10) but virtually inevitable. Especially when viewed in the context of the events leading up to the accident, upon encountering someone unexpectedly in the highway, defendant's action in swerving to the right to avoid hitting Reese was "the most reasonable course of action under the conditions" *(People v Beiter,* 77 AD2d 214, 217) and cannot be regarded as "a gross deviation from the standard of care that a reasonable person would observe in the situation" (Penal Law § 15.05 [4]).

Finally, while the fact of defendant's impairment while operating his vehicle is conceded, its source is a subject of some uncertainty. Defendant, by his own admission, had consumed a number of beers. Defendant also testified that, in the collision with Strangalos's car, "I cracked my head against my door frame." Defendant alleges that he was frightened by the actions of Strangalos and his passenger, who were pursuing his automobile with no clear purpose. Finally, an expert witness testified that a separation in the muffler system of defendant's vehicle could have caused carbon monoxide to build up in the passenger compartment.

Accordingly, I further conclude that the evidence is insufficient to sustain a conviction of criminally negligent homicide *(People v Beiter, supra; see also, People v Roberts,* 72 AD2d 954; *People v Perry,* 123 AD2d 492), and would reverse the judgment.