■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JULES KARP, Respondent.—

The People appeal from an oral decision, rendered February 27, 1987, which dismissed, with leave to re-present, an indictment for reckless endangerment in the first degree (Penal Law § 120.25). Supreme Court issued a one-sentence ruling which states, "I find that the questioning on the part of the District Attorney in the Grand Jury presentation was overly vigorous and that it prevented this Defendant from fully and fairly testifying and I therefore am dismissing the indictment against him with leave for the People to represent."

On this appeal, we are confronted with the anomalous situation of a victim of a crime who finds himself the object of a criminal prosecution. This case arose out of the theft of approximately $1,400 from defendant's person on a crowded street in midtown Manhattan. At about 1:30 on the weekday afternoon of March 27, 1986, upon returning from the bank to his rare coin shop at 36th Street and Broadway, defendant was pushed from behind by an unknown perpetrator, identified only as a young, black male who reached into his victim's pocket, seized the money and fled. Defendant drew a .38

caliber revolver, for which he possessed a valid carry permit, and fired two shots in the general direction of the fleeing thief. The People allege that defendant fired into a crowded street, recklessly endangering the lives of innocent bystanders. Two witnesses testified that they saw defendant fire with his arm extended, parallel to the ground. However, there was no testimony as to whether or not the barrel of the weapon was angled up in the air. It is evident that the bullets were never recovered and, in any event, the People do not assert that any bodily injury or property damage resulted from the discharge of the firearm. Defendant maintains that he simply fired into the air intending to cause the thief to stop or someone in the crowd to apprehend him. Whatever the true version of the facts, it is clear that defendant fired two shots on a busy, midtown street in such a manner as to avoid hitting any person or any object.

The briefs submitted upon this appeal address the issue of whether the Assistant District Attorney's questioning of defendant was overly vigorous so as to warrant dismissal of the indictment on the ground that defendant was thereby prevented from fully and fairly testifying before the Grand Jury. As the dissent points out, defendant was permitted to make a statement, uninterrupted save for a single valid objection as to relevancy. In our view, however, this matter requires a more detailed analysis, both of the procedure under which the indictment was obtained and the law under which defendant is sought to be prosecuted.

As the Court of Appeals has noted, the Grand Jury stands as a "buffer between the State and its citizens, protecting the latter from unfounded and arbitrary accusations" *(People v Calbud, Inc.,* 49 NY2d 389, 396). To this end, the accused is entitled to a proceeding which involves a fair presentment of the facts, permitting an intelligent assessment of the merit to the prosecution's case. Before the Grand Jury, "the prosecutor performs the dual role of advocate and public officer, charged with the duty not only to secure indictments but also to see that justice is done * * *. The prosecutor's duty of fair dealing extends not only to the submission of evidence, but also to instructions on the law, for, by statute, responsibility for instructing the Grand Jury on the law rests solely with the court and the prosecutor, and the Grand Jury may not seek legal advice from any other source" *(People v Lancaster,* 69 NY2d 20, 26; *see also, People v Pelchat,* 62 NY2d 97, 105). By this standard, the Assistant District Attorney's presentation can hardly be said to be above reproach.

At the introduction of the Grand Jury presentation three charges were posed for the grand jurors' consideration: attempted assault in the first degree (Penal Law §§ 110.00, 120.10), criminal possession of a weapon in the second degree (Penal Law § 265.03), and reckless endangerment in the first degree (Penal Law § 120.25). We note that as a matter of law under the facts presented by this case, the first two charges are entirely without foundation. A person cannot attempt to commit an assault by engaging in reckless conduct (Penal Law § 120.10 [3]; *People v Williams,* 40 AD2d 1023). Recklessness involves no intent but is inferred from an objective assessment of the defendant's conduct in view of the surrounding circumstances *(People v Register,* 60 NY2d 270, 277). Since an attempt requires the *intent* to engage in the prohibited conduct, a crime lacking this element cannot serve as the predicate for an attempt. The District Attorney, apparently recognizing that this element was lacking, dropped the assault charge following the conclusion of the testimony.

The same analysis applies to the weapons charge (Penal Law § 265.03) which requires that a weapon, without regard to whether it is otherwise legally possessed, be carried with the intent to employ it in a criminal act. Again, an act which does not involve the element of intent cannot serve as the predicate for an offense which involves premeditation. It is clear, therefore, that these charges were brought merely for the sake of instilling prejudice against the accused and are not sustainable under any construction of the facts presented by the People.

As to the crime of reckless endangerment, with respect to which the Grand Jury returned a true bill, we find that the Assistant District Attorney's presentation to the Grand Jury, viewed in its entirety, was so misleading that it cannot be permitted to stand, whether or not it may be viewed as being supported by legally sufficient evidence *(People v Calbud, Inc.,* 49 NY2d 389, 395, *supra).* In particular, the failure to instruct the Grand Jury about the defense of justification, as it pertains to reckless endangerment, operated to the distinct prejudice of the accused. The Court of Appeals "has rejected a restrictive application of the defense and, instead, has permitted the defense to be raised against diverse charges involving the use of force, regardless of the relevant *mens rea" (People v McManus,* 67 NY2d 541, 547).

In the matter under review, justification is an obviously relevant defense which casts serious doubt on various elements of the crime alleged. As stated in *People v Davis* (72

NY2d 32, 35-36), "Reckless endangerment in the first degree is committed when a person, under circumstances evincing a depraved indifference to human life, recklessly creates a grave risk of death to another (Penal Law § 120.25). A person acts recklessly when he is aware of, but disregards, a substantial and unjustifiable risk to the degree that his behavior does not comport with the manner in which a reasonable person would have acted under the circumstances (Penal Law § 15.05 [3])". The statute requires that the reckless behavior constitutes a "gross deviation" from the standard which would be observed by the reasonable person (Penal Law § 15.05 [3]). The justification defense, which is an ordinary and not an affirmative defense *(People v McManus, supra,* at 546), provides in material part,

"A private person acting on his own account may use physical force, other than deadly physical force, upon another person when and to the extent that he reasonably believes such to be necessary to effect an arrest or to prevent the escape from custody of a person whom he reasonably believes to have committed an offense and who in fact has committed such offense; and he may use deadly physical force for such purpose when he reasonably believes such to be necessary to:
* * *

"(b) Effect the arrest of a person who has committed * * * robbery * * * and who is in immediate flight therefrom" (Penal Law § 35.30 [4]).

In the course of his Grand Jury testimony, defendant stated, "I fired two shots with the hope that somebody would stop the person or better yet that the person would stop himself and I would recover my money." He further stated, "I thought by firing up in the air, the man would halt or somebody else would stop the fleeing person." It is sufficiently clear that defendant's action was designed to halt the thief's flight and secure his apprehension, which conduct falls squarely within the purview of the statute. Defendant's use of deadly physical force is also justifiable *in defense of his person* if he believed that the suspect was "committing or attempting to commit * * * robbery" (Penal Law § 35.15 [2] [b]). It is not unreasonable for defendant to have entertained the subjective belief that robbery was being committed, which is all that the statute requires *(People v Goetz,* 68 NY2d 96). It is unreasonable to expect the layperson to appreciate the subtle legal distinction between larceny from the person (Penal Law § 155.30 [5]) and robbery (Penal Law § 160.05), especially in immediate response to the perpetration of a criminal act and

without opportunity for reflection. The Grand Jury actually received instruction on this defense but not with respect to the reckless endangerment charge, and it is therefore highly significant that the Grand Jury returned a true bill only with respect to this offense.

The standard for instructing a Grand Jury was established in *People v Calbud, Inc.* (49 NY2d 389, 394-395, *supra):* "We deem it sufficient if the District Attorney provides the Grand Jury with enough information to enable it intelligently to decide whether a crime has been committed and to determine whether there exists legally sufficient evidence to establish the material elements of the crime." Where, as here, "the evidence suggests that a complete defense such as justification may be present, the prosecutor must charge the grand jurors on that defense, providing enough information to enable them to determine whether the defense, in light of the evidence, should preclude the criminal prosecution" *(People v Goetz, supra,* at 115). The Assistant District Attorney's failure to instruct the Grand Jury as to justification on the charge of reckless endangerment, standing alone, is a sufficient basis to sustain Supreme Court's dismissal of the indictment (CPL 210.20 [1] [c]; 210.35 [5]; *People v Valles,* 62 NY2d 36, 38; *People v Calbud, Inc., supra,* at 396).

As discussed *infra,* whether justification is a complete defense to the crime of reckless endangerment is far from clear. For purposes of the present discussion, it is sufficient to note that justification mitigates, or even negates, certain elements of the crime of reckless endangerment. Particularly in deciding whether defendant's conduct represents a gross deviation from the standard by which a reasonable person would have been guided, conduct which is deemed reasonable *as a matter of law* is highly relevant to the Grand Jury's deliberation. Justification for defendant's conduct is also pertinent to the question of whether a depraved indifference to human life is indicated or whether a legitimate motive may be ascribed to his actions. Therefore, the uncertainty regarding the scope of the justification defense notwithstanding, the failure to instruct the Grand Jury as to its application to the crime of reckless endangerment was highly prejudicial.

As to defendant's testimony before the Grand Jury, we do not agree with the dissent that the questioning by the Assistant District Attorney was necessarily fair or within the acceptable bounds of cross-examination. In the attempt to establish the proximity of the fleeing suspect to people on the street, she engaged defendant in the following colloguy:

"Q. There were people within a few feet of this man, isn't that a fact?

"A. The man was in the middle of the street.

"Q. And it was a crowded street?

"A. Where the man was in the middle of Broadway?

"Q. And there were people on the street at that time, isn't that a fact?

"A. He was in the gutter.

"Q. Were there people on the street at that time?

"A. Many people.

"Q. And so there were people in the vicinity of the man who was running, isn't that a fact?

"A. Many people.

"Q. And there were people within a few feet from this man who was running, isn't that a fact?

"A. Well, any direction you run in that area, there's lots of people.

"Q. So, is that a fact?

"A. That's a fact there were people within 20 feet of the gentleman, yes.

"Q. There were people within three feet of * * * this gentleman, isn't that a fact?

"A. I couldn't say that's a fact.

"Q. It was a crowded street, isn't that your testimony?

"A. It was a crowded street but the time I fired the pistol the man was in the middle of the gutter. He was the only one in the gutter at the time. You had people, you had cars and, you had people in the cars."

In view of the failure of any of the People's witnesses to testify regarding the proximity of the suspect to passersby and defendant's therefore uncontroverted answer that the nearest person was 20 feet away, this line of questioning was without foundation under the rules of evidence, which are expressly made applicable to Grand Jury proceedings by CPL 190.30 (1). Moreover, the Assistant District Attorney's oft-repeated assertion that there were passersby "within three feet" or "within a few feet" of the suspect, accompanied by the query "[I]sn't that a fact?", can only be regarded as prejudicial. The Grand Jury could have readily concluded that the People possessed evidence to establish that defendant fired his weapon while the suspect was in close proximity to innocent bystanders. Such questioning is misleading (see, People v Monroe, 125 Misc

2d 550, 555) and violates the prosecutor's "duty of fair dealing to the accused and candor to the courts" *(People v Pelchat,* 62 NY2d 97, 105, *supra).*

The standard of conduct with which a private person using justifiable force must comply is a matter of some uncertainty. Specifically, if the use of deadly physical force is justified, may he nevertheless be criminally liable for reckless endangerment? This question was addressed in *People v Jacobs* (105 Misc 2d 616), in which the court compared Penal Law § 35.30 (2), governing police and peace officers, with section 35.30 (4), governing private persons. The court noted that a police officer's justifiable use of deadly physical force does not constitute justification for reckless conduct "amounting to an offense against or with respect to innocent persons whom he is not seeking to arrest or detain in custody" (Penal Law § 35.30 [2]). However, no such constraint on the justification for use of deadly physical force is contained within the subdivision dealing with the private person (Penal Law § 35.30 [4]). This incongruity raises two questions. First, does it reflect legislative intent that justification for the use of deadly physical force normally operates to absolve a person of criminal liability for acts that might otherwise be considered reckless? Second, if it does not, what standard of conduct is to be observed by the private person who justifiably employs deadly physical force? The court in *People v Jacobs (supra,* at 624) engaged in a rather detailed analysis of the legislative history of Penal Law § 35.30 (2), concluding that, as to the first question, it was "inconceivable that the Legislature intended to permit such conduct" by absolving the private person of criminal liability for reckless acts. The court nevertheless dismissed the indictment for reckless endangerment in the interest of justice (CPL 210.40).

While the court's reasoning is not illogical, the conclusion is equally compelling that the Legislature did not intend to hold the private person to the same high standard as that which applies to a trained law-enforcement professional. We also note that, on the question of the scope to be accorded the justification defense, the Court of Appeals has observed that the Legislature chose "to use a single statutory section which would provide either a complete defense or no defense at all to a defendant charged with any crime involving the use of deadly force" *(People v Goetz,* 68 NY2d 96, 110, *supra).* The Court of Appeals has further stated, "Justification does not make a criminal use of force lawful; if the use of force is justified, it cannot be criminal at all" *(People v McManus,* 67

NY2d 541, 545, *supra).* Taking these pronouncements at face value and applying the defense liberally without regard to the pertinent *mens rea (People v McManus, supra,* at 547), justification may be viewed as a complete defense to the crime of reckless endangerment. Thus, "had the Grand Jury believed that defendant's acts were justified, no indictment would have been returned and an unwarranted prosecution would have been avoided" *(People v Valles,* 62 NY2d 36, 39, *supra).*

On the question of the standard to be observed by the private person using justifiable deadly force, we note only that once it is concluded that the standard is unclear in the absence of an express statutory provision, an issue of constitutional dimensions is presented. Prosecution of a private individual (as opposed to a peace officer, whose standard of conduct is expressly stated) for the crime of reckless endangerment (Penal Law §§ 120.20, 120.25) under circumstances where the use of deadly force is justified may run afoul of constitutional due process guarantees on the ground that the pertinent statute (Penal Law § 35.30) is void for vagueness as it applies to this offense. While it is unnecessary to address this issue to dispose of the appeal before us, it is obviously relevant to any prosecution which might be brought based upon a subsequent indictment of defendant.

In view of our disposition, it is unnecessary to reach defendant's contention that his right to a speedy trial was violated. Concur—Ross, Ellerin and Rubin, JJ.

Sullivan, J. P., and Milonas, J., dissent in a memorandum by Sullivan, J. P., as follows: The majority essentially finds two separate reasons to sustain the motion court's dismissal of the indictment. It concludes that the District Attorney improperly failed to instruct the Grand Jury on the defense of justification with respect to reckless endangerment. This is an issue that was not raised either on the motion, in an earlier motion to dismiss or on appeal. In addition, the majority finds fault with the prosecutor's questioning of defendant at the time he testified before the Grand Jury. In particular, the majority is troubled by the questions regarding defendant's proximity to passerby at the time he fired his revolver and by the prosecutor's "oft-repeated assertion that there were passersby 'within three feet' or 'within a few feet' of [defendant], accompanied by the query '[I]sn't that a fact?' " (at 383). Since, in my view, the record fails to demonstrate defendant's entitlement to a justification instruction with respect to the reckless endangerment charge, and the prosecutor's questions were by no means improper, I respectfully dissent. I also note

my disagreement with the motion court's more generalized conclusion (at 379) that the prosecutor's questioning was "overly vigorous" and prevented defendant from "fully and fairly testifying".

At approximately 1:30 P.M. on March 27, 1986, near the corner of Broadway and 36th Street in Manhattan, defendant, a 39-year-old businessman, was returning to his shop, the Rare Coin Store, at 1359 Broadway, from a bank where he had made a deposit. As defendant approached the store, he was pushed from behind by a young male, who took $1,400 in cash from his pocket and then fled. Defendant immediately turned and stepped into the street, yelling for the thief to stop. When the fleeing perpetrator was, according to two disinterested witnesses, a "good half block" away, or according to defendant, 15 to 20 feet away, defendant pulled out a silver-plated revolver and fired two shots. According to the two witnesses, as defendant fired, his outstretched arm was straight and parallel to the ground. As the shots rang out, hundreds of pedestrians along the crowded streets "scattered". No one was injured and no damage was reported.

Defendant was arrested at the scene immediately after the shots were fired. A .38 caliber Smith and Wesson revolver, loaded with three live rounds and two spent shells, was taken from him and his "carry" permit for the weapon confiscated. Ballistics tests confirmed that defendant's gun had recently been fired, and that both the weapon and ammunition were operable.

After formally executing a waiver of immunity, defendant made the following statement to the grand jurors concerning the events:

"My name is Jules Karp and I have two shops in midtown Manhattan, one at 372 7th Avenue, which I had for over 11 years and one at 1359 Broadway, which is near 36th Street and Broadway, which I had for over three years. I buy and sell rare coins and I buy and sell jewelry and precious stones. I have been in business for 25 years. I have had a New York carry pistol permit, which is one of the most difficult things to get. You have to have one of the cleanest records to carry a permit. For 14 years, never once have I ever drawn the pistol out of its holster. Never once have I had an incident. Never been convicted of a crime and I regard myself as a law abiding citizen.

"On March 27, I went to Marine Midland Bank at the corner of 37th Street and 7th Avenue and deposited $9,000 in

cash U.S. currency. Ninety-nine percent of the time when I go to the bank, I take money out. This day I happen to make a $9,000 cash deposit. After coming out of the bank, I went to my store at 36th Street and Broadway and prior to going into the store, a man pushed me and went into my pocket, got about $1,400 and proceeded to flee. If you look at the area there of 36th and Broadway, which is Herald Square District, right near Macy's very heavily, very heavy with pedestrians, cars, windows and after having been pushed and my pockets picked, I then proceeded to yell, halt, stop, pulled my gun out of the holster, and fired two shots in the air. There's no way that even if I wanted to fire at the person I would never fire at anybody for money. I fired two shots with the hope that somebody would stop the person or better yet that the person would stop himself and I would recover my money.

"As I said before, I have never been arrested. I have at stake here my pistol permit, which is not so important. I have a second hand dealer's license. If I'm convicted of a felony. I would lose my second hand dealer's license, which means I'il lose a great deal of my livelihood. I practice a lot at the pistol range at 20 West 20th Street. I am a good shot. If I clearly wanted to hit the person, there's no way from 15 or 20 feet, I would have missed, no way. As sure as I'm talking to you, no, sir. How sure I am. If I wanted to hit him, I could have hit him. If I did fire at the person and had assuming I missed, there is no way you couldn't hit a pedestrian, a car, a window or if you look at the general area, there's no way you couldn't have created some kind of havoc unless one fired up in the air.

"In all the years of my life, I'm 39 right now, I never had any incident, have no convictions, never was a defendant in a grand jury. This is my first time in my whole life. I have never been in any situation like this.

"I think over this incident after being robbed, I face jail. I don't feel I should go to jail.

"[The Prosecutor:] Excuse me, that is not relevant to the grand jury proceedings.

"[Defendant:] Okay, but what is, I fired two shots in the, up in the air, yelled the man to halt. This man, I don't know if he is still running or what the story is and I'm sorry, I have not —I'm really just trying to tell you as it happened. I didn't really, not really appeared before a grand jury. It has me a little nervous. I hope you forgive me for that and basically the whole incident took only 30 seconds. In dealing with something that happened 30 seconds in time, I lost $1,400. I didn't

get angry but I was a little upset about losing this money and I thought by firing up in the air, the man would halt or somebody else would stop the fleeing person.

"[The Prosecutor:] Does that conclude your statement?

"[Defendant:] Yes, it does."

The prosecutor, with inquiries which comprised approximately six pages of transcript, then questioned defendant with respect to three aspects of his account. By asking if he had not held his outstretched arm parallel to the ground, as described by the eyewitnesses, she explored defendant's claim that he had shot "up in the air". In response, defendant maintained that he had fired his gun "in the air, in the direction of where the man was fleeing but certainly not at him" and demonstrated a firing stance indicating that his arm had been at a 45-degree angle from the ground. By inquiring about the number of buildings in the surrounding area, and defendant's proximity thereto, the prosecutor then pursued defendant's assertion that "there is no way" that he would not have "hit a pedestrian, a car, a window" unless he had fired "up in the air". Finally, the prosecutor questioned defendant about his statement that the street was "very heavy with pedestrians" at the time he fired. Defendant explained that although the streets were "crowded", the unapprehended thief was the only person "in the middle of [vehicular] traffic" at the time he fired. The grand jurors then posed several questions along the same lines, asking defendant about the surrounding buildings, the width of the streets, and the direction in which the thief fled.

When a person testifies before the Grand Jury in his own behalf, he must be permitted to "give any relevant and competent evidence concerning the case under consideration. Upon giving such evidence, he is subject to examination by the people." (CPL 190.50 [5] [b].) Thus, after completing his testimony to the Grand Jury, the person "may be impeached within the limits of proper cross-examination." *(People v Rosa,* 145 Misc 2d 423, 425 [Sup Ct, NY County]; *see also, People v Green,* 80 AD2d 650.) From this record, it is clear that defendant was allowed to make a complete statement to the Grand Jury as to his version of the events and that the prosecutor did not question him pursuant to the right accorded her under CPL 190.50 (5) (b) until after he indicated that his statement was complete.

The provision affording the prosecutor the right to inquire is a necessary corollary to the grand jurors' function of investi-

gating allegations of criminality. Thus, it is incumbent upon the prosecutor to clarify testimony and to elicit facts so that the grand jurors may make an informed determination. Were the role of the prosecutor in the Grand Jury otherwise, the function of the People and that of the Grand Jury itself would be emasculated. Unless the prosecutor is permitted to do more than passively inquire as to "what happened", the grand jurors will not have any way of uncovering the true facts underlying the crime. Indeed, to require the prosecutor to be the "legal advisor" to the Grand Jury (see, CPL 190.25 [6]) without affording him the opportunity to challenge the testimony of the various eyewitnesses prohibits the Grand Jury from fulfilling its mission as an indispensable investigative arm of the criminal justice system and hampers its power to return appropriate charges against those suspected of wrongdoing.

The motion court found that even though defendant had the opportunity to give a complete and uninterrupted statement, he was prevented from "fully and fairly" testifying when the prosecutor thereafter questioned him in an "overly vigorous" manner. Any objective reading of the Grand Jury minutes, however, demonstrates that the prosecutor's questions were fair and properly aimed at eliciting facts and clarifying testimony. Indeed, in whatever context they are viewed, the prosecutor's inquiries were restrained and well within the bounds of propriety. The motion court's ruling to the contrary would effectively eliminate the ability of a prosecutor to challenge the testimony of an interested witness, thus depriving the Grand Jury in many cases of a sufficient basis on which to make its determination.

The prosecutor's occasional use of the prefatory phrases "Isn't it true that" and "Isn't it a fact", common tools of cross-examination used both for impeachment purposes and for clarification of direct testimony, was well within the bounds of permissible inquiry. The mere phrasing of the prosecutor's inquiries could not undo the impact of the account defendant had been allowed to convey in his lengthy narrative. Nor did the prosecutor's style of inquiry even remotely approach the pointed, accusatory style often employed at trial.

In support of his motion to dismiss, defendant relied primarily, as he does on appeal, on *People v Gardner* (NYLJ, Feb. 5, 1987, at 12, col 4). There, the court found that the prosecutor "went far beyond the bounds of propriety" by making remarks such as " '[y]ou are asking us to believe you picked up three bags of marijuana in the gutter?' " *(Supra.)* Even assuming

the propriety of that ruling, the sarcastic and argumentative nature of such an inquiry distinguishes it from the type of questioning here. Similarly, in *People v Davis* (119 Misc 2d 1013), also cited by defendant, the court, in dismissing the indictment, pointed not simply to the biting and hostile nature of the examination, but to the information the prosecutor sought to adduce. The questioning had suggested that the defendant, who was charged with assault, was "violence-prone". Here, in striking contrast, the prosecutor never attempted to impeach defendant with general character traits. Instead, the examination was centered on the differences between the eyewitnesses' testimony and that of defendant— matters well within the scope of a proper examination. While defendant "couldn't say [that it was] a fact" that there were people within three feet of the fleeing suspect, he readily admitted that there were many people "in the vicinity" of the suspect and, indeed, within 20 feet of him. Thus, even if there was no evidence to support the prosecutor's assertions that there were people within three feet or a few feet of the suspect, the questioning cannot be considered so misleading as to violate the prosecution's "duty of fair dealing to the accused and candor to the courts". *(People v Pelchat,* 62 NY2d 97, 105; *cf., People v Monroe,* 125 Misc 2d 550, 555.)

Further, even if the prosecutor's questioning of him was inappropriate, defendant has utterly failed to demonstrate that the integrity of the Grand Jury was impugned in such a way as to prejudice him. (CPL 210.35 [5]; *cf., People v Thompson,* 116 AD2d 377 [although prosecutor erred in not advising grand jurors that evidence of a defendant's prior criminal acts is to be used for credibility purposes only, dismissal of indictment not warranted because evidence overwhelmingly demonstrated guilt].) Here, besides having had a complete opportunity to convey his story to the Grand Jury, defendant was able to present evidence of his good standing as a businessman, the fact that he had no prior record, and had a carry permit for his revolver. It is also noteworthy that his attorney, who was present in the Grand Jury, did not perceive any prejudice or impropriety at the time of the prosecutor's questioning. Instead, defendant's attorney first raised this complaint in a second, belated motion to dismiss the indictment brought after an earlier motion to dismiss had been denied and only after the decision in *Gardner (supra).*

The defense of justification, as to which the majority finds the Grand Jury should have been instructed, enables a defendant to avoid criminal responsibility for the use of deadly

physical force. Such a defense, it should be noted, is antithetical to the defense theory advanced here, i.e., that defendant did not use deadly physical force but merely fired his pistol in the air, endangering no one.

In addition, as applied in this case, the use of deadly physical force is justifiable only if a robbery had in fact been committed (Penal Law § 35.30 [4] [b]) or if defendant reasonably believed that another person was committing or attempting to commit a robbery (Penal Law § 35.15 [2] [b]). In his initial description of the incident, defendant said that "a man pushed [him] and went into [his] pocket, got about $1,400 and proceeded to flee". Upon questioning, defendant admitted that he "felt a bump from behind and the next thing [he] saw was [the suspect's] hand coming out of [defendant's] pocket with the money." This is insufficient to establish a taking by force or threat of force (see, Penal Law § 160.00; see also, People v Davis, 71 AD2d 607).

The majority holds that it is not unreasonable for defendant to have entertained a subjective belief—which is all that is required under Penal Law § 35.15 (2) (b) (People v Goetz, 68 NY2d 96)—that a robbery was being committed. First of all, there is nothing in the record to suggest that defendant entertained a belief that he was the victim of a robbery, rather than a larceny. At no time in his Grand Jury testimony, in the proceedings in the Supreme Court or on this appeal did he make this assertion. In addition, since, according to his testimony, no force was used, such a belief on the part of defendant would not have been reasonable.

Nor can defendant rely on Penal Law § 35.15 (2) (b) and claim that deadly physical force was "necessary to avert [any] perceived threat". (People v Goetz, supra, at 106.) Subdivision (2) of section 35.15 must be read in conjunction with subdivision (1). (Supra, at 106, n 5.) At the time defendant discharged his weapon, according to his own testimony, no threat existed; the taking was completed and the suspect was in flight. Thus, defendant cannot claim that he "reasonably believe[d deadly physical force was] necessary to defend himself". (Penal Law § 35.15 [1].)

Even if defendant might arguably have been the victim of a robbery, I cannot agree with the majority that defendant can avoid criminal responsibility for his reckless conduct—discharging his weapon on a crowded Manhattan thoroughfare— by claiming that he reasonably believed such conduct to be necessary to effect the arrest of the suspect. (See, Penal Law § 35.30 [4] [b].) "The defense [of justification] does not operate

to excuse a criminal act, nor does it negate a particular element of a crime. Rather, by recognizing the use of force to be privileged under certain circumstances, it renders such conduct entirely lawful". *(People v McManus,* 67 NY2d 541, 546.) As the court observed in *People v Jacobs* (105 Misc 2d 616, 624), in rejecting defendant's argument that he was justified in shooting an innocent bystander during the course of an attempt to apprehend a robber: "It is inconceivable that the Legislature intended to permit such conduct. For example, if a person forcibly robbed a person of a wallet in Yankee Stadium and ran down the aisles, a civilian could fire numerous shots at him, regardless of the danger to hundreds of innocent bystanders. If the defendant's view should prevail, the civilian shooter could not be held criminally liable even if he killed a dozen people. This court cannot believe that the Legislature intended such an absurd result."

Defendant's other argument, that his right to a speedy trial has been violated by the lengthy delay in perfecting this appeal, is without merit. CPL 30.30 (4) provides that, in computing time chargeable to the People for speedy trial purposes, "the following periods must be excluded: (a) a reasonable period of delay resulting from other proceedings concerning the defendant, including but not limited to * * * appeals". We previously considered and rejected this argument on the People's motion for an enlargement of time in which to perfect their appeal. It has been held that an order granting the People an extension of time to perfect their appeal constitutes a finding that the time requested was reasonable for purposes of CPL 30.30. *(People v Grafton,* 136 AD2d 960, 961, *affd* 73 NY2d 779.)

Accordingly, the order dismissing the indictment should be reversed and the indictment reinstated.