OPINION OF THE COURT
William C. Donnino, J.
The initial question presented is whether a civilian who uses *76 deadly physical force to effect the arrest of a person who has in fact just robbed that civilian and is in immediate flight from that robbery is liable for reckless homicide when the result of the use of that deadly force is to kill a person who was not the robber. The answer given by the law of New York is that there is no criminal liability for the homicide under those circumstances.
The secondary question is whether the Grand Jury in this case was properly charged on that applicable law as it may have related to the evidence before the Grand Jury. The answer to that question is no.
I. The Evidence before the Grand Jury
The evidence before the Grand Jury indicates that on February 18, 1995 at about 7:45 p.m., the defendant was operating the family bodega when two men entered. One of the two men appeared to position himself as a lookout while the other one pointed a shotgun at the defendant and robbed him. There were two other employees in the different parts of the store who observed portions of the robbery. The perpetrator with the shotgun was described as a dark skinned male, wearing a dark green ski jacket and a black hat or "hood” or an item "like a ski mask” though the face was not covered; the other perpetrator was described as a male, dressed in a black hat, and a black coat or jacket.
The perpetrators exited the store, which was located at 178th Street and Webster Ave., and headed west on 178th Street toward the next block, Valentine Ave., and Echo Park which was on the west side of Valentine Ave. The defendant testified that as the perpetrators left the store:
"I just thought about stopping them. It was the second time [in] less than a month that we had been robbed. I didn’t think twice about it. I grabbed a weapon * * * [and] I went outside.
"As far as I was concerned they were the same ones, the same size, the same black hood. I yelled out to them, hey. The taller one, the one in the dark hood turned around towards me and he was like trying to get something out of his coat. I thought I had seen the shotgun again. I thought that it was going to be used against me. So, I shot first, I fired first.”
The defendant’s recollection was that he fired five or six uninterrupted bullets at the two people who were on the sidewalk on 178th Street heading toward Valentine Ave. Those two, he said, were the only two people he saw on the sidewalk. After firing the shots, he returned to the bodega.
*77 The primary, disinterested, eyewitness to the event was a person who was riding his bike on 178th Street toward Echo Park. His first viewing is of the defendant standing outside the bodega with a gun in his hand. He then saw the defendant go to 178th Street, and on 178th Street facing in a westerly direction toward Valentine Avenue, "first” point the gun in the direction of the sidewalk and fire three or four shots. At some point, the witness saw people on 178th Street go between two cars into the middle of the street and run toward Echo Park. There is no detailed questioning of the witness as to the location of these two persons at the time of the initial shots though a permissible, reasonable and logical inference is that to get to the street from between two parked cars they had to have been on the sidewalk first. After discharging three or four shots, the defendant then fired four more shots in the direction of the two who had gone between the parked cars and into the middle of 178th Street. These two people were dressed in dark ski jackets and dark ski hats. The eyewitness saw two other people on the sidewalk of 178th Street who were ahead of the two who had gone into the street. The defendant’s shot killed a person whom the eyewitness testified was one of the two on the sidewalk who was ahead of the two who went into the street.
The friend of the person who was killed and who was accompanying the deceased at the time testified that neither he nor his friend engaged in the robbery. They were walking west on 178th Street toward Valentine Ave., heard multiple shots, ran toward Valentine Ave. and Echo Park, and his friend fell mortally wounded in the middle of Valentine Ave. When the friend of the deceased first heard the shots, he saw two men running in back of him; one of them was wearing a black ski jacket. The friend of the deceased was wearing a black ski jacket and a black ski hat; the deceased was wearing a light colored coat. The eyewitness did not think the deceased and his friend were the ones in the street based on the relative size of the people, but, he could make no facial distinctions and identifications.
The defendant was not provided an opportunity to view the person who was shot and indicate whether that was the person he was shooting at and believed to be the robber. The defendant was asked to look at the deceased’s friend as he sat in a patrol car parked at the scene of the shooting. The defendant seemingly identified the friend of the deceased as one of those involved in the robbery; however, the defendant testified in the *78 Grand Jury that when he had looked into the car he was not able to see the person’s face and made the identification on the basis of the friend’s clothing and physical appearance. One of the two employees did not see the robbers’ faces and could make no identification; the other employee, in what only can be described as confusing testimony as to his capacity to identify either robber, appeared at best to indicate that the friend of the deceased did not seem like one of the robbers.
In charging the Grand Jury on justification pursuant to Penal Law § 35.30 (4) (b), the District Attorney effectively took the position that a victim of a robbery who properly used deadly physical force to arrest a robber who was in immediate flight from the robbery but did so in such a manner as to kill an innocent passerby could be held criminally liable for the death of the passerby. So charged, the Grand Jury indicted the defendant for depraved indifference murder, reckless manslaughter, reckless endangerment, and several counts of criminal possession of a weapon.[1] The charge to the Grand Jury was in error. New York law provides that the citizen who properly uses deadly physical force to arrest a robber who is in immediate flight from the robbery and in so doing unintentionally injures or kills a passerby is not criminally liable for that tragic death.
II. Justification
The applicable statute, Penal Law § 35.30 (4) (b), reads as follows:
"4. A private person acting on his own account may use physical force, other than deadly physical force, upon another person when and to the extent that he reasonably believes such to be necessary to effect an arrest or to prevent the escape from custody of a person whom he reasonably believes to have committed an offense and who in fact has committed such offense; and he may use deadly physical force for such purpose when he reasonably believes such to be necessary to * * *
"(b) Effect the arrest of a person who has committed murder, manslaughter in the first degree, robbery, forcible rape or forcible sodomy and who is in immediate flight therefrom.”
*79 To understand the full meaning of that statute, it is necessary to review its history. The current Penal Law went into effect on September 1, 1967. Shortly thereafter, the justification provisions engendered a serious public debate. In the words of the Executive Director of the Commission that drafted the then revised Penal Law: "Another difficult area was the justification provisions. We leaned a little too far to the left, to the civil libertarians’ approach, and the roof fell in on us.” (Drafting a New Penal Law for New York, 18 Buff L Rev 251, 256.) In response to a "public demand” for a reexamination of the justification provisions, the New York State Senate Committee on Codes held public hearings on the justification article, receiving the testimony of 90 people. (Legis mem, 1968 McKinney’s Session Laws of NY, at 2245.) Those hearings led to legislation revising the justification article both in form and substance. (L 1968, ch 73, approved and eff Mar. 21, 1968.)
In that 1968 legislation, section 35.30 of the then revised Penal Law was repealed and a new section 35.30, containing a number of substantive changes, was enacted. Two of those changes bear on the issue presented.
First, the provisions authorizing the justifiable use of deadly force by a police or peace officer to make an arrest were considered too restrictive and they were expanded. For current purposes, the substance of those changes is not important. What is important is that the expanded authorization for the justifiable use of deadly physical force by a police or peace officer was qualified by a provision (Penal Law § 35.30 [2]) that made the officer who justifiably used deadly physical force to effect an arrest criminally responsible for the reckless assault or homicide of an innocent person from the exercise of such force.[2]
Second, the law governing the justifiable use of force by a citizen to make an arrest was expanded. That law was expanded by adding the above-quoted provision (Penal Law § 35.30 [4] [b]) that authorized under the specified circumstances the use of deadly physical force to effect an arrest where one of the specified crimes (including robbery) was com *80 mitted. and the perpetrator was in immediate flight. The Legislature expressly recognized that this provision "represents a distinct innovation in New York law, both as it presently exists under the Revised Penal Law and as it existed under the former law.” (Legis mem, 1968 McKinney’s Session Laws of NY,-at 2245, 2247.)[3]
Under the former Penal Law and initially in the revised Penal Law the citizen was not authorized to use deadly force to effect an arrest except upon reasonable belief that the person sought to be arrested was using or about to use deadly force against the citizen or another.
"That rule [explained the Penal Law commentators of that time] was grounded in an aversion to the picture of an ordinary citizen stalking an alleged criminal in bounty hunting style with the intention of capturing him dead or alive. Though logical and sound from that viewpoint, the doctrine has frequently been criticized in its application to arrests made or attempted immediately after the commission of particularly heinous crimes. The criticism may be illustrated by considering the case of a man who, immediately after a burglary of his home during which he was robbed and his wife raped, seizes a gun, looks out the window and sees the culprit fleeing down the street. Under the [former law], he would not be justified in using the gun for apprehension purposes. With cases of that nature in mind,” the Legislature amended the law. (Denzer and McQuillan, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 35.30, 1974 Pocket Part, at 76.)
Most importantly, the amended law contained no provision— similar to the one included for an officer — expressly making the citizen criminally responsible for reckless assault or homicide of an innocent person during the otherwise justified use of deadly force to effect the arrest of a rapist or robber.
Given the setting within which this legislation was drawn, it is plain, as we shall see, that the Legislature acted deliberately in including the qualified liability provision for an officer and not for the citizen.
Initially, the justification article was in substance and in structural format influenced by the Model Penal Code. (People v Goetz, 68 NY2d 96, 109 [1986]; Denzer and McQuillan, *81 Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law art 35 [1967].) The Model Penal Code justification sections were written to provide justification for certain uses of force irrespective of the result of that force, and any restrictions as to the result of that use were separately provided for in a different section. In fact, New York’s provision (Penal Law § 35.30 [2]) qualifying the extent of an officer’s authority to use justifiable force to effect an arrest of certain felons was drawn from Model Penal Code § 3.09 (3). As explained, that section was separate and apart from the sections of the Model Penal Code that set forth the justification rules, and the Model Code provision made that qualification applicable to all its justification provisions dealing with the use of force upon or toward the person of another. So, New York (albeit expanding its justification provisions beyond those of the Model Penal Code) followed the Model Penal Code structure (even in the 1968 revisions) of setting forth its justification provisions without qualification, and then, in the one instance where it decided to accept one of the Model Penal Code qualifications, New York plainly made a conscious decision not to extend the Model Penal Code’s qualification on the use of force upon or toward the person of another beyond a police or peace officer effecting an arrest.
Next, remember the justification provisions came under intense public scrutiny soon after they were enacted; there were extensive legislative hearings; the Legislature was specially focused on the limited issue of justification. Various provisions deliberately expanding the justifiable use of force by police and citizens were enacted. In fact, the legislative memorandum in support of the revised justification provision dealing with a citizen’s justifiable use of force to effect an arrest acknowledged that that statute was new to New York law. That bespoke the Legislature’s knowledge and special attention to that provision. While focused on that new law, the Legislature in the same statute included the qualification on the use of force by police and peace officers but excluded it from applicability to the new statute dealing with the use of force by a civilian to effect an arrest. Further, the repealed statute of the revised Penal Law had a similar qualification on the use of force by a police or peace officer to effect an arrest, but, that former statute éxposed the police or peace officer to criminal liability for criminally negligent conduct as well as reckless conduct. Thus, the Legislature plainly reconsidered carrying the repealed provision over into the new section and *82 in doing so was more restrictive in its scope than its ancestor. That careful attention to the details of this provision again illustrates the intense focus of the Legislature on this provision and makes it clear that it deliberately chose to apply the qualification exclusively to police and peace officers. Finally, as if to put the exclamation point on its decision to differentiate between a police or peace officer and a citizen, the Legislature added another provision in the 1968 legislation, specifying that "[w]henever a person is authorized by any [justification] provision to use deadly physical force in any given circumstance, nothing contained in any other [justification] provision may be deemed to negate or qualify such authorization.” (Penal Law § 35.10 [6].)
With that history in mind, common sense and the normal rules of statutory construction dictate that the inclusion of a qualification on the justifiable use of such force by an officer and its exclusion in the justifiable use of such force by a citizen in the same statute be read as deliberate expression of the legislative will to qualify the justification provisions as applied to an officer but not as applied to a citizen.
It is of no significance that the statute or legislative memorandum did not expressly state that the citizen who properly uses deadly force to effect an arrest of a fleeing robber is not criminally liable for the unintentional injury or death of a passerby. In the absence of the express qualification to the contrary, the uniform rule that obtained from the language of the justification provisions applied. That rule, as we shall see, is that the justification statutes excuse certain uses of force from criminal liability without regard to the consequences of that use of force.
The applicable statute permits the "use” of deadly physical force when the user reasonably believes deadly physical force is necessary to effect the arrest of a person who has committed robbery and who is in immediate flight therefrom. All the justification statutes speak to the "use” of force; it is the use that is made lawful, irrespective of the result of that use unless there exists, as with the police and peace officer effecting an arrest, an express legislative direction to the contrary. As the Court of Appeals has recognized the Legislature has chosen "to use a single statutory section which would provide either a complete defense or no defense at all to a defendant charged with any crime involving the use of deadly force.” (People v Goetz, supra, 68 NY2d, at 110.) "Justification does not make a criminal use of force lawful; if the use of force is justified, it *83 cannot be criminal at all.” (People v McManus, 67 NY2d 541, 545 [1986].)
Factually in McManus (supra), one reasonable view of the evidence was that defendant’s friend was being assaulted and robbed by a group of people some of whom were armed, and at his friend’s desperate urging, the defendant fired a rifle into the group, killing someone in the group. It is not clear to what extent, if any, the person killed was involved in the assault of the defendant’s friend. The jury, charged with justification as to intentional murder, found the defendant not guilty of that charge. But, told in effect that justification did not apply to reckless homicide, the jury found the defendant guilty of depraved indifference murder. The Court of Appeals reversed, holding that it is the "use” of force that is privileged regardless of the actor’s mental state; accordingly, it is irrelevant that the user may have acted with a reckless culpable mental state. "[T]here is no basis for limiting the application of the defense of justification to any particular mens rea or to any particular crime involving the use of force. Indeed, the Legislature has clearly not done so.” (People v McManus, 67 NY2d, at 547, supra.) That is equally true as to the statute in question which structurally parallels the statute in issue in McManus.
Both statutes speak to the "use” of force, not the result of the force used. The requirement that the citizen reasonably believe that the person against whom the force is being used be in fact the perpetrator is written as the predicate for the "use” of the force, not as a qualification on the applicability of the defense should a person, not the perpetrator, be the person injured or killed. That view is supported by the grammatical structure of the statutory sentence, and its parallel structure to the statute so construed in effect in McManus (supra). It is also supported by the language of the statute that anticipates that a person, other than the person sought to be arrested, may be the one against whom force is used. Thus, the statutory language justifies the use of force upon "another” person when necessary to effect the arrest of "a” person. That construction means that the person upon whom the use of force is directed need not be the person sought to be arrested. For example, in apprehending "a” person who in fact has committed the requisite felony, force may have to be used against "another” person who may be attempting to prevent the arrest. If the Legislature meant to limit the use of force to the robber, the statutory language would have been written to *84 reflect that the person against whom the force was being directed had to be the person sought to be arrested. (See and compare, e.g., Penal Law § 35.15 [1].) Plainly, therefore, the requirement that the actor be seeking to arrest a person who in fact committed the requisite felony is a predicate to the use of the force and not a restriction on whom the force is used against.
In People v Jacobs (105 Misc 2d 616 [Sup Ct 1980]), the court held that it was "inconceivable” that the Legislature deliberately chose to excuse reckless conduct in the use of deadly physical force to effect the arrest of a robber who was in immediate flight from the crime because such a law could lead to "absurd” results in excusing those who recklessly injure or kill others under such circumstances. (Supra, at 624.) To reach its conclusion the Jacobs court posited an atypical, admittedly horrifying, hypothetical of a person robbed in Yankee Stadium who fired recklessly in the pursuit of the robber and killed a dozen people. Because that result was a theoretical possibility under the statute as written, the Jacobs court judged that the Legislature could not have intended that and held that the citizen was liable for reckless conduct in effecting the arrest of a robber in immediate flight from the crime. Incompatible with that conclusion, however, was the Jacobs court’s further decision to dismiss the charges against Jacobs in the interest of justice, implicitly finding that excusing Jacobs from liability in that case was not absurd. Factually, Jacobs presented the typical scenario. Jacobs was accosted on a public street by a person with a gun and robbed. When the robber sought to leave, Jacobs pulled out a gun and ordered the robber to stop. The robber fled and Jacobs pursued him. Innocent people were in the area. Jacobs fired about five times, missed the robber, and hit an innocent passerby. By fortunate happenstance, that passerby received an injury that did not cost him his life.
When statutory meaning is unclear and legislative intent is wanting, a court may be informed of the legislative intent by determining that the interpretation being advanced by a party bespeaks an absurd result in the case, and thus could not have been the intended meaning. If the result proffered in the case being adjudged would be fair, concluding that the statute bespeaks absurd results based upon an atypical hypothetical is not an intellectually compelling claim. Indeed, if statutes were subject to that form of analysis to pass muster, many would fail. In Jacobs (supra), as noted, the court plainly did not find the result proffered in that case, the nonprosecution of Jacobs, or even in the typical case represented by Jacobs, absurd.
*85 In any event, when the statutory meaning and legislative intent of a statute is clear, that "a” result may in a court’s view be absurd is not by itself sufficient to permit a court not to follow the legislative direction.[4] In the end, therefore, the difficulty with the Jacobs conclusion is that the evidence is overwhelming that the Legislature did intend what Jacobs (supra) found unacceptable. To summarize that evidence, there is the legislative history of the statute which bespeaks a Legislature giving exceptionally careful attention to the drafting of the statute; there is the following of the Model Penal Code structure to extend justification to the use of force not the result of that use unless expressly stated to the contrary; there is the only express statement to the contrary being limited to the officer effecting an arrest; there is the exclusion of that express statement to the contrary in the provision dealing with a citizen effecting an arrest; and finally, there is the plain language of the justification provision, particularly as interpreted by McManus (supra) (which was decided subsequent to Jacobs).
In People v Karp (158 AD2d 378 [1st Dept 1990], revd on other grounds 76 NY2d 1006 [1990]), albeit not before them for decision, a majority of that Court found that the justification provisions applicable to a citizen effecting an arrest do apply to reckless conduct. In that case, a citizen was robbed in a public street and fired at the fleeing robber. Albeit no one was hit by the fire, Karp was prosecuted for reckless endangerment. In addressing the question of whether the prosecutor unfairly deprived Karp of testifying fully in the Grand Jury, the majority went on to indicate that notwithstanding Jacobs (supra), the defendant who testified that he sought to "stop” the robber by firing the two shots was entitled to have the jury charged on the law of justification as applied to a citizen effecting the arrest of a robber in immediate flight from the robbery.
It is, of course, not for the courts to determine the wisdom of legislation. The policy issue of whether and to what extent to permit prosecution of a citizen for the consequences of his/her conduct in attempting to arrest a felon in immediate flight from the commission of the felony often against that citizen is a difficult determination.
*86 While the Legislature did not explain why it drew a distinction between a police and peace officer and a citizen, there is one explanation to be found in part in the statute itself. The officer need not be correct in his/her reasonable belief that the person the officer is seeking to arrest committed an enumerated felony; nor is the officer restricted to using the deadly physical force to effect the arrest of a person who is in immediate flight from the commission of the felony. Before using deadly physical force, the citizen must be correct in his/her reasonable belief that the person he/she is seeking to arrest committed an enumerated felony and that such person is in immediate flight from the commission of the enumerated felony. Given that the police and peace officer is specially trained, inter alia, in the responsible use of firearms under trying circumstances, and that he/she was being authorized to use that deadly physical force on a much broader scale than the citizen, the Legislature wanted some statutory incentive for the police to act responsibly in the use of their broad power to use deadly physical force by holding them responsible for reckless conduct. In fact, those who opposed the legislation did so on the grounds that the legislation accorded too much authority to the police to use force. (See, 1968 Bill Jacket, Senate Bill S 4104-A.) For the citizen who could not be presumed to have had training in the use of deadly physical force, and who would be acting often under stress, on the spur of the moment, in response to the commission of an enumerated felony and while the felon was in immediate flight from that felony, and who would often otherwise be a responsible member of the community, the Legislature chose not to hold that citizen accountable for an otherwise justifiable use of force that resulted in injury or death to the wrong person. Reasonable people may disagree with that decision, but the Legislature made its choice among the options presented and whether we agree or disagree with the law across the board or in its application to a particular situation, we are bound to accept the legislative direction. The question remains whether the Grand Jury was properly instructed on that law.
III. The Charge to the Grand Jury
In the Grand Jury, the District Attorney appreciated that a reasonable view of the evidence in a light, as dictated by the law, most favorable to the accused required that the instant defense of justification be charged. (See, People v McManus, 67 NY2d, at 549, supra; People v Valles, 62 NY2d 36 [1984].)
*87 However, after reading the statutory language of Penal Law § 35.30 (4) (b) to the Grand Jury, the District Attorney gave the following qualifying instruction: "If you find that the person shot by the defendant, [the deceased], was not one of the robbers, then as a matter of law the defendant’s conduct under that section, subdivision (b), is not justified for those charges * * * pertaining to [the deceased].” The District Attorney now argues that, assuming arguendo, that charge was in error, there was no reasonable view of the evidence before the Grand Jury to have warranted the justification charge in any event and thus any error in that charge is harmless. The District Attorney was correct in his initial judgment that there was a reasonable view of the evidence warranting a charge on the defense. The charge was in error because it assumed that the defense was inapplicable if the result of the use of the force was to kill a person other than the perpetrator of the robbery even though the citizen was using the force to effect the arrest of the persons whom he believed were, and were in fact, the robbers.
The District Attorney’s view of the evidence before the Grand Jury is that the evidence unequivocally bespeaks two events. In the first event, the defendant is shooting in the direction of the sidewalk only at the two people, including the deceased, who were not involved in the robbery, and it is in that shooting that the deceased is killed. In the second event the defendant is shooting into the street where purportedly the real perpetrators of the robbery are.[5]
However, a reasonable view of the evidence, premised primarily on the testimony of the eyewitness, is to the contrary. The reasonable inferences to be drawn from that testimony is that there were two sets of two people going west on 178th Street, the robbers, and in front of them the deceased and his friend. The robbers were the closest to the defendant. The defendant fired first at two people on the sidewalk. Here, the District Attorney assumed that the robbers had already left the sidewalk and were between the parked cars going into the middle of the street. But, the eyewitness was not examined closely as to the placement of those two at the time of the first shots and there thus remains a reasonable inference they were *88 still on the sidewalk when the first shots were fired. That inference is bolstered by the eyewitness adding that there was then a second grouping of shots aimed at the two people who had gone into the street. It is also bolstered by the testimony of the deceased’s friend who testified that he and the deceased were on the sidewalk and at the time of the shots he glanced back and saw a few people there who were also running away and one of those people was wearing a black, heavy ski-type jacket. The defendant testified that he fired at the two robbers because he wanted to "stop” them and only after he believed that the one with the shotgun was about to use it against him. Admittedly, he only recalled one grouping of shots, not two separate shootings, and claimed to have been firing only at the two he saw on the sidewalk. But, the eyewitness testimony would permit the inference that those two people were the robbers before they left the sidewalk to enter the street. Whether it is a reasonable inference on those facts that the defendant was seeking to effect the arrest of the two robbers who were in immediate flight from the robbery and in using deadly physical force to effect that stop, missed the robbers and hit an innocent bystander was for the Grand Jury to determine. Suffice it to say that the evidence permitted that inference and if the Grand Jury so found, then the defendant would have been justified in the use of that force and not liable for the reckless homicide of the innocent bystander.
The failure to have permitted the Grand Jury to consider this defense of justification even if the deceased was not one of robbers plainly prejudiced the defendant and impaired the integrity of the jury, and requires that the counts charging reckless homicide and reckless endangerment be dismissed, with permission granted to the District Attorney to represent the case to another Grand Jury. Since the defense of justification is not applicable to the counts charging the defendant with criminal possession of a weapon, those counts are sustained.

. The District Attorney took the position in the Grand Jury that the citizen was exposed equally to crimes with an intentional culpable mental state. The Grand Jury, however, decided not to indict defendant for intentional homicide. Of course, from the standpoint of sentence, there is no distinction between intentional murder and depraved indifference reckless murder; both require a sentence of imprisonment with a minimum between 15 and 25 years and a maximum of life.

. That then new provision (Penal Law § 35.30 [2]), which is currently in effect, reads as follows: "2. The fact that a police officer or a peace officer is justified in using deadly physical force under circumstances prescribed in paragraphs (a) and (b) of subdivision one [of section 35.30] does not constitute justification for reckless conduct by such police officer or peace officer amounting to an offense against or with respect to innocent persons whom he is not seeking to arrest or retain in custody.”

. Other substantive changes also expanding the justifiable use of force by a citizen were made in the provisions dealing with the justifiable use of force in defense of premises and in defense of a person in the course of a burglary in Penal Law § 35.20.

. "The lawmakers may enact an absurd statute; and hence an absurdity couched in unambiguous language must be enforced by the courts so far as possible. It is only in the case of ambiguous statutes that the rule for the avoidance of absurdity becomes applicable.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 145, at 297.)

. The District Attorney tended to convey his view of the evidence to the Grand Jury particularly when he charged the Grand Jury that if they find that the two people in the street were the robbers then "defendant’s conduct for shooting at those two people” was justified and the defendant was thus not criminally liable for attempted murder of them.