OPINION OF THE COURT
Frank Diaz, J.
The defendant Levine stands accused of having raped, sodomized and sexually abused a young girl who at the time of the alleged acts was 6 and 7 years old. Defendant Taylor is charged with having raped this same young girl during the same time period. They are also charged with endangering her welfare in violation of section 260.10 of the Penal Law. After selection of the jury and before the opening statement by the Assistant District Attorney, the minutes of the Grand Jury presentation were turned over to defense counsel as required by CPL 240.45 (1). The following day — January 23 — both defense counsel moved to dismiss the indictment on the ground that the Grand Jury proceedings were defective within the meaning of CPL 210.35 (5). The motion having been made in writing as requested by the People and the People having responded, it is decided as follows:
A. Timeliness
The People argue that denial of the motion as untimely would not be an abuse of discretion. That argument is found to be without merit and the court holds that it must decide this motion on the merits.
CPL 255.20 (1) provides that all pretrial motions, with certain exceptions, are to "be served or filed within forty-five days after arraignment and before commencement of trial”. In the fall of 1988, these two defendants filed an omnibus motion which, inter alla, requested an inspection of the Grand Jury minutes and dismissal of the indictment on the grounds that the evidence was insufficient and the legal instructions were improper. The motion was denied on October 31, 1988. The *93 motion now being considered is, of course, similar to the 1988 motion to the extent that it seeks dismissal of the indictment. However, the motion is being made on a totally different ground, to wit: the alleged prejudicial manner in which the case was presented to the Grand Jury.
CPL 255.20 (3) directs that the court "must entertain and decide on its merits, at any time before the end of the trial, any appropriate pre-trial motion based upon grounds of which the defendant could not, with due diligence, have been previously aware”. In the instant case, the attorneys had no legal access to the Grand Jury minutes until just before the opening statement was to be delivered. It was only then that they became aware of what they perceived to be defects in the Grand Jury proceedings and they promptly moved to dismiss the indictment. Given this sequence of events, the court believes that CPL 255.20 (3) requires this court to decide this motion on the merits.[1]

B. The Presentation Before the Grand Jury

The argument for dismissal, in the main,[2] is premised on the allegation that there was so much testimony of uncharged crimes presented to the Grand Jury that the integrity of its proceedings was impaired with resulting prejudice to the defendants. The indictment, as filed on March 17, 1988, charged defendant Levine with having raped, sodomized and sexually abused Lucille C. at various times during the period from December 1, 1986 to December 31, 1986. Three of the counts accuse this defendant of forcible rape during this time period. In addition, defendant Levine is charged with another act of forcible rape with the same child during the period of October 1 to October 26, 1987. Therefore, this defendant is charged with 4 different acts of rape in the first degree on the theory that force was used. There are also 4 counts of statu *94 tory rape charged to Levine. The court has assumed that these counts correspond to the counts charging rape based on force.
Defendant Taylor is also charged with 4 counts of forcible rape and all are alleged to have taken place during the period of December 1 to December 31, 1986. He is also charged with 4 counts of statutory rape and the court has again assumed that these counts relate to the same incidents which form the basis for the forcible rape counts. The end result is that the indictment as it reads today charges each defendant with 4 counts of rape in the first degree.
Testimony to support these charges was presented to the Grand Jury on February 9, 25, and March 15, 1988. During the course of the first session on February 9, the Grand Jury transcript reflects that the following took place:
"Q. Who else lived with you?
"A. Doris and Trina, Lucky, Carol
"Q. Who is Doris?
"A. My sister
"Q. How old is Doris? Is she 13?
"A. Yes
"Q. Doris is your sister?
"A. Yes
"Q. Did the men ever make love to Doris?
"A. Yes
"Q. How many times?
"A. A lot of times
"Q. The same time they were in the room with you?
"A. Yes
"Q. And Bobby was there?
"A. Yes
"Q. Which men made love to Doris, which ones do you remember — Lucky?
"A. Yes
"ms. jenning: Let the record reflect the witness has pointed to the Lucky doll.
"Q. Did any of the others — did Andy?
"A. Yes
"Q. Did Andy make love to Doris?
"A. Yes
"Q. Did Jeff make love to Doris?
*95 "A. Yes”.
During the session of February 25, 1988, when Lucy again testified, the following testimony was elicited:
"Q. The day before that in October of 1987, last October, you remember?
"A. Yes
"Q. Who was in your house that day, do you remember? was Lucky there?
"A. Yes
"Q. Was it Lucky, Jeff, Bobby and Angela?
"A. Yes
"Q. Who is Angela?
"A. Make believe this Angela "Q. How old is Angela?
"A. Six
"Q. And the next day when the B.C.W. came they took Angela too, right?
"A. Yes
"Q. How is — who does Angela belong to?
"A. Francis * * *
"Q. What happened that day?
"A. That day he made love to Angela "Q. And who is that doll?
"A. Lucky doll
"Q. That is the Lucky doll?
"A. Yeah
"ms. jennings: indicating the Lucky doll "Q. Lucky made love to Angela?
"A. Yes
"Q. Were you there?
"A. Yes
"Q. You saw this?
"A. Yes
"Q. When you say he made love to Angela, what did he do. Did he have his clothes on?
"A. Off
"Q. Do you know what room this was in?
"A. Same room, the living room "Q. In your house?
*96 "A. Yes
"Q. Now, show the Grand Jury what Lucky did to Angela when he made love to her
"ms. jennings: For now, the Bobby doll will play the Angela doll
"A. This is how they did it
"Q. Where was Angela, on the floor, on a bed, where?
"A. On the floor
"ms. jennings: Let the record reflect that the Lucky doll is on top of the Angela doll, and the penis of the Lucky doll is inside the vagina of the Angela doll”.
There were other instances where evidence of uncharged crimes was elicited from the young witness. The transcript of the February 9 session reveals the following exchange:
"Q. Now, we’re talking about December of 1986, the same month that you didn’t have the Christmas, remember?
"A. Yes
"Q. All right, now, do you remember in February of 1987 when Lucky went away somewhere?
"A. He went to jail. When he came out of his door, the policemen were right there
"Q. Now, between the time in December that we’re talking about, and in February when Lucky went to jail. Did this happen between those two times, the same — these same type of things with Jeff and Lucky and Bobby and Andy?
"A. It happened lots of times”.
At page 34, lines 21 through 25, the following question was asked and answered:
"Q. Okay, now, between the time in February of 1987 and when Thomas was born in July of 1987, did these things happen?
"A. Yes”.
The indictment shows that these defendants have not been charged with having committed any crimes between December of 1986 and February of 1987 nor between February of 1987 and July of 1987.
The record also shows that the witness at the February 9 session also testified in the following manner:
"ms. jennings: Let the record reflect the witness is pointing to the penis of the Lucky doll, and is now placing the penis of the Lucky doll inside the vagina of the Lucy doll.
*97 "Q. Was that the first time that Lucky ever did that?
"A. Yes
"Q. That was the first time?
"A. Yes
"Q. How many — did Lucky ever do that more than once?
"A. Alot of times
"Q. How many times; do you know?
"A. Alot of times
"Q. Well, remember back when we talked about December 1986, the month when you didn’t have a Christmas tree, and you told me about Jeff, and Jeff was on top of you, and you said Lucky was on top of Bobby. Did Lucky do anything to you that time?
"A. When he was done, some other men I don’t know—
"Q. Other than — other than Lucky and Andy and Jeff?
"A. Some other men, I didn’t know their names, they got on top of me to make love — alot of men” (emphasis supplied).
During the session on March 15, 1988, the child testified as follows:
"Q. Lucky made love to you many times, am I right? Do you remember saying that?
"A. Yes
"Q. Now, when you say many times—
"A. You have to count
"Q. How high can you count?
"A. A lot of numbers
"Q. Can you show us how high you can count? Can you count to twenty? Go ahead.
"A. One, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, nineteen, twenty
"Q. Did Lucky make love to you the way you showed us with the dolls more than one time?
"A. Yes
"Q. Did he make love to you the way you showed us with the dolls more than two times?
"A. Yes
"Q. Was it more than three times?
"A. More than three times
"Q. Okay. Was it four times?
*98 "A. More than four times
"Q. Okay. It was at least — you’re saying it was more than four times, am I right?
"A. Yes”.

C. Legal Discussion

CPL 210.35 (5) provides: "A grand jury proceeding is defective within the meaning of paragraph (c) of subdivision one of section 210.20 when * * * [t]he proceeding otherwise fails to conform to the requirements of article one hundred ninety to such degree that the integrity thereof is impaired and prejudice to the defendant may result.”
In People v Darby (75 NY2d 449, 455 [1990]) Judge Bellacosa, writing for the court, stated that in making a motion to dismiss under this section, the defendant must first meet "the very high hurdle of impairment of the integrity of the Grand Jury process.” He characterized the test under this section to be "very precise and very high” (supra, at 455). After careful consideration, I have concluded that the errors committed during the Grand Jury presentation of this case rise to the level described by Judge Bellacosa.
It is well established that while presenting a case to a Grand Jury, the prosecutor acts not only as an advocate but also as a public officer duty-bound to fairly deal with the accused. (People v Lancaster, 69 NY2d 20 [1986].) Thus, "the accused is entitled to a proceeding which involves a fair presentment of the facts, permitting an intelligent assessment of the merit to the prosecution’s case.” (People v Karp, 158 AD2d 378, 379 [1st Dept 1990].) To this end, in presenting a case, the prosecutor, with few exceptions, must be guided by the rules of evidence that prevail at trial. (CPL 190.30 [1].) In short, the prosecutor’s obligation is not to obtain an indictment at all costs, but to be even-handed so that the Grand Jury can fairly and dispassionately consider the evidence. It is with these principles in mind that I have read the Grand Jury minutes.
There is no question that during the presentation there was testimony regarding uncharged crimes by these two defendants. Such evidence is normally not admissible unless its probative value outweighs its prejudicial effect. (See, People v Grafton, 115 AD2d 952 [4th Dept 1985]; People v Buchanan, NYLJ, Jan. 10, 1991, at 28, col 3 [Sup Ct, Kings County].)
While apparently conceding the legal principle, the People *99 argue that the fact that this evidence was inadmissible should not be a basis for dismissal of the indictment since this "evidence was brief and not highlighted by the prosecutor.” This court cannot agree with this characterization. The record clearly shows that the prosecutor by leading questions elicited from the child witness damaging testimony that these defendants had not only raped her "a lot of times” but also had raped two other female children, Doris and Angela. This evidence is highly detailed, explicit and it is all in response to questions by the prosecutor. (Compare, People v Jackson, 167 AD2d 893 [4th Dept 1990].)
The danger in the introduction of this type of evidence is, of course, that it will be used to conclude that the accused has the propensity to commit the crime charged. (See, People v Bagarozy, 132 AD2d 225 [1st Dept 1987].) Even when such evidence is deemed admissible, a Trial Judge is required to give limiting instructions both when the evidence is first presented and in his final charge to ensure that it will be properly considered. (People v Robinson, 68 NY2d 541, 549-550 [1986].) In this case, to compound the problem, no such instructions were given to the Grand Jury specifically directing their attention to this testimony and advising them on how it was to be assessed. That the prosecutor had this obligation cannot be gainsaid. (CPL 190.25 [6].) Instead of giving precise limiting instructions, the prosecutor told the Grand Jury: "You’re free to consider all of the evidence you’ve heard” (emphasis supplied).
The court can well understand why no such instructions were given since one would be hard pressed indeed to explain to the Grand Jury the relevance of the uncharged crimes— particularly those relating to Doris and Angela — to the charges being considered against Taylor and Levine. Given this, the court can only conclude that this evidence could only be used to show that Levine and Taylor had the propensity to sexually molest young girls. This type of evidence is, of course, not admissible for that purpose. (People v Alvino, 71 NY2d 233, 241 [1987].)
In an effort to salvage this indictment, the People have made certain arguments that the court will now consider. They urge this court to conclude that the Grand Jury in this case was "an investigative body with broad exploratory powers * * * [whose] function * * * [was] to investigate a wide variety of allegations and then determine whether there [was] legally sufficient evidence and reasonable cause to believe that *100 a person had committed a crime.” But this was not a Grand Jury empaneled to investigate, for example, whether there was bribery in a particular industry or abuse of a governmental program. This Grand Jury was charged with the responsibility of deciding whether there was reason to believe that certain crimes had been committed by identified individuals against Lucy C. To this end, evidence that these two defendants may have raped other young girls was totally irrelevant.
The People also argue that they had received information that these defendants had raped Doris and Angela in the presence of Lucy C. and that the "District Attorney [had] determined to pursue the investigation of this matter during its pendency before the Grand Jury.” The argument continues that at the time Lucy C. testified "it was presumed that additional charges would be brought concerning Doris and Angela” and it seemed in the interest of Lucy to have her testify as to all matters.
The chronology of this investigation is somewhat murky to this court. Thus, it appears that, as early as January 22, 1988 the detective conducting the investigation had interviewed Doris and had been told by her that she had "never [been] touched by any of her mother’s friends.” Furthermore, it is not clear when Angela was interviewed and it was discovered that she would be worthless as a witness. Be that as it may, this court does not believe it necessary to get involved in this factual morass in order to decide the motion.
The law is clear that evidence of uncharged crimes — particularly those similar to the ones with which the defendant is accused — is highly prejudicial and is only allowed under very limited circumstances. If the People wanted to spare Lucy the ordeal of testifying twice, the answer to that is very simple. Finish the investigation and then, having assessed the results, decide what crimes are going to be presented and who the targets are, and then put Lucy on the stand. This court has been given no reason why this procedure could not have been adopted.
Instead, the People chose to present evidence of uncharged crimes — apparently without having then decided whether these matters would result in an indictment — and, then, having decided not to further pursue these matters, they failed to even instruct the Grand Jury to disregard all that evidence. In short, the rights of the defendants to a fair presentation were studiously ignored.
*101 Citing People v Fuller (50 NY2d 628 [1980]), the People argue that the evidence of uncharged crimes was admissible to show defendants’ "amorous design”. Putting aside the fact that the amorous design theory only applied to acts perpetrated against the victim and not someone else, the short answer to the argument is that Fuller was effectively overruled in People v Lewis (69 NY2d 321 [1987]). (See, People v Hudy, 73 NY2d 40, 55 [1988].)
Finally, the People argue that by deciding not to pursue the Angela and Doris allegations — even though Lucy C.’s testimony was sufficient to indict the defendants for these crimes —the People thereby conferred a benefit on these defendants. The court finds that this argument proves too much since, under this theory, the People would be allowed to present evidence relating to every possible crime of which the defendants were suspected and then decide after the presentation which of the crimes would be submitted to the Grand Jury for consideration. In any event, it is difficult to see how evidence of uncharged crimes could at any time be beneficial to a defendant.

Conclusion

For the reasons stated above, the court concludes that the integrity of the Grand Jury process was impaired within the meaning of CPL 210.35 (5). The court also finds that this impairment not only raised the possibility of prejudice to the defendants (People v Wilkins, 68 NY2d 269, 277, n 7 [1986]), but resulted in actual prejudice.
It is with extreme reluctance that I dismiss this indictment with leave to re-present. In my judgment, there was legally sufficient evidence presented to the Grand Jury to conclude that there is reasonable cause to believe that these two defendants have committed heinous crimes against a helpless child. I am also mindful of the fact that a dismissal may result in emotional harm to the child.
Nevertheless, I have concluded that the rights of these defendants were seriously abridged during the presentation of this case. The vague and inconclusive testimony by Lucy C. that she had been raped "a lot of times” by the defendants juxtaposed against the vivid and highly detailed testimony that these very same defendants had also raped two other young girls converted this Grand Jury presentation into a wide ranging exploration — without regard to the rules of *102 evidence — into the horrors visited upon Lucy C. as well as other children.
In fairness to the prosecutor who was largely responsible for presenting this case, I must add that, perhaps she was so moved by the child’s suffering — a suffering confirmed by the mother’s confession — so moved and shaken was she — that she momentarily forgot her basic obligation as a prosecutor: to be fair. While understanding her human reaction, I must do my duty as I see it.
The motion is granted. The indictment is dismissed with leave to re-present.

. People v Dean (74 NY2d 643 [1989]), cited by the prosecutor in support of her untimeliness argument, does not require a different result. In Dean, unlike the instant case, the defect in the supporting deposition was readily apparent and yet counsel did not make his motion to dismiss until over three months after arraignment. Under those circumstances, the court simply held that denial of the motion as untimely was proper.

. Defendant Taylor has also moved to dismiss on the grounds that there was a Brady violation (Brady v Maryland, 373 US 83 [1963]) as well as prosecutorial misconduct. For the reasons stated in People v Perez (105 Misc 2d 845 [Sup Ct, Bronx County 1980]), the Brady argument is found to be without merit. The allegations regarding prosecutorial misconduct raise no need for a hearing and the motion to dismiss on that ground is denied.